Luis RAMIREZ, et al., Plaintiffs,

v.

Austin J. DeCOSTER, d/b/a/ Decoster Egg Farm, et al., Defendants.

No. 98–186–P–H.

United States District Court,
D. Maine.

March 31, 2000.

350

Harold J. Friedman, Friedman, Babcock & Gaythwaite, Portland, ME, for Estados Unidos Mexicanos, Luis Ramirez, Servando Campos, Isidro Portales, Genaro Romo Rodriguez, Jose R. Hernandez, Esther Hernandez, Rigoberto Diaz, Jr., Edgar Elizondo, Maria Elizondo, Lauro Garcia, Dora Garcia, Elda Hernandez, Juan Ramon Hernandez, plaintiffs.

Timothy J. O'Brien, Verrill & Dana, Portland, ME, Jeffrey A. Schreiber, Schreiber & Associates, P.C., Danvers, MA, John J. McGivney, Rubin & Rudman, LLP, Boston, MA, for Austin J. Decoster, dba Decoster Egg Farm, dba Austin J. Decoster Company, defendant.

Thomas H. Somers, Hoff, Curtis, Pacht, Cassidy & Frame, Portland, ME, Kerin E. Stackpole, Bergeron, Paradis & Fitzpatrick, Burlington, VT, for Quality Egg of New England, Maine AG, defendants.

Timothy J. O'Brien, Verrill & Dana, Portland, ME, for Maine Contract Farming, LLC.

## ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

HORNBY, Chief Judge.

Former and current employees of DeCoster Egg Farms ("DeCoster") bring this action on behalf of themselves and all other DeCoster employees of Mexican descent. The workers claim that DeCoster injured them in numerous ways: by violating their civil rights under 42 U.S.C. § 1981 (racial discrimination); by violating their rights under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 et seq. (1983) (unsafe and unsanitary housing and false and misleading information regarding the terms and conditions of employment); by breaching their contracts (failure to provide free housing); and by fraudulently inducing them to enter into an employment relationship with DeCoster (false representations of free housing, safe housing, and free transportation). They seek to impose successor liability on a number of other companies.[1] The workers have moved for certification of their class and DeCoster has moved for summary judgment on all counts. Two of the successor companies, Quality Egg and Maine AG, have also moved for summary judgment on all counts against them.

I hold that (1) because the workers seek primarily compensatory and punitive damages and demand jury trials to assess them and because individual issues predominate, it is inappropriate to certify a class under Fed. R.Civ.P. 23; (2) the workers are not "migrant agricultural workers" under the AWPA and are thus ineligible for protection under that Act; and (3) the workers have presented no genuine issue of material fact to support

their fraud and breach of contract claims and DeCoster is entitled to judgment as a matter of law on those claims. Therefore, I **DENY** the plaintiffs' motion to certify the class with respect to all claims and I **GRANT** DeCoster's motion for summary judgment as to the workers' AWPA, fraud, and breach of contract claims. I **GRANT** DeCoster's motion for summary judgment on plaintiffs Servando Campos's, Juan Hernandez's, and Elda Hernandez's individual claims of discrimination. I also **GRANT** DeCoster's motion for summary judgment as to the individual section 1981 claims regarding job placement, the provision of apartments, and the provision of pay. Further, I **GRANT** Maine AG's motion for summary judgment on plaintiff Isidro Portales' section 1981 and AWPA claims. I also **GRANT** Maine AG's and Quality Egg's motion for summary judgment as to the workers' successor liability claim because the workers have shown no genuine issue of material fact regarding whether Maine AG and Quality Egg may be liable as successors of DeCoster. What remains for trial are individual claims of racial discrimination against DeCoster on behalf of Luis Ramirez, Isidro Portales, Genaro Romo, Jose R. Hernandez, Esther Hernandez, Edgar Elizondo, Maria Elizondo, Lauro Garcia, and Dora Garcia.

## I. ANALYSIS

### A. MOTION TO CERTIFY THE CLASS

#### 1. 42 U.S.C. § 1981

Pursuant to Fed.R.Civ.P. 23(b)(2) and 23(b)(3), the workers seek certification as a class representing all workers of Mexican descent who are or were employed at DeCoster after 1988. The workers allege that DeCoster engaged in an overall pattern or

---

**1.** Until September 1997, DeCoster Egg Farms was a vertically integrated egg farming operation with its own feed mill, hatchery, hen houses, egg processing facilities, and other related operations. In September 1997, DeCoster reorganized into several separate companies, only one of which, Maine Contract Farming, is still headed by Austin DeCoster. Those separate companies are: L & L Cleaning, Inc.; Nezinscot Properties, Inc.; Northern Transportation, Inc.; PFS Loading Services, Inc.; Turner Maintenance and Services, Inc.; Turner Properties, Inc.; Maine Contract Farming, LLC; Maine AG, LLC; and Quality Egg of New England, LLC. On July 1, 1999, I issued an oral order granting the plaintiffs leave to amend the complaint and to add the first seven of the separate companies as defendants. Those companies were served a copy of the amended complaint on October 20, 1999. At this point, only the companies served with the original complaint, DeCoster Egg Farms, Maine AG, and Quality Egg, have moved for summary judgment.

practice of discrimination against workers of Mexican descent through (1) subjective decision-making; (2) blatant disparate treatment regarding job placement, housing placement, the application of job performance standards, and access to medical services; and (3) the maintenance of a racially hostile work environment. *See* Am.Compl. ¶¶ 31, 38, 40, 44–47. Specifically, they seek on behalf of the class general compensatory and other non-pecuniary damages, punitive damages, reasonable attorney's and expert's fees, a permanent injunction enjoining DeCoster "from maintaining a policy of discrimination against Mexicans regarding the terms and conditions of their employment," and a declaratory judgment that DeCoster's practices violate section 1981. Am.Compl. pp. 12–13.

### (a) Fed.R.Civ.P. 23(b)(2)

 Certification under Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate *final injunctive relief or corresponding declaratory relief* with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2) (emphasis added). The Advisory Committee Notes on Rule 23 state that subdivision (b)(2) "does *not* extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed. R.Civ.P. 23 advisory committee notes (emphasis added). In determining whether money damages predominate, I follow the standard enunciated by the Fifth Circuit: "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief. . . . By incidental, we mean damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998) (internal citations omitted) (emphasis in original).

 The relief sought in this case is predominantly money damages and, as such, is inappropriate for 23(b)(2) certification. The only injunctive relief the workers seek is to enjoin DeCoster from maintaining its alleged policy of discrimination in the terms and conditions of employment. However, only one of the named plaintiffs, Genaro Romo, is currently employed in the DeCoster operation (as an employee for Maine Contract Farming). Enjoining DeCoster from future acts of discrimination will not assist the plaintiffs who are no longer employed with DeCoster or its successor companies. The crux of the workers' complaint is their prayer for compensatory and punitive damages. Rather than seek back pay, an equitable remedy, the workers have instead requested compensatory damages resulting from their "emotional pain and mental anguish" and their "loss of enjoyment of life." Am.Compl. at ¶¶ 52, 53. These are legal remedies requiring individualized jury determinations of damages, dependent on intangible, subjective differences of each worker's circumstances, and are inappropriate for a 23(b)(2) class action. *See Allison*, 151 F.3d at 415–17; *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 897 (7th Cir.1999) (noting that in actions for compensatory and punitive damages in which a party seeks certification under 23(b)(2), it is possible for one member to recover substantial damages while another receives nothing); *cf. Carey v. Piphus*, 435 U.S. 247, 254–56, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (holding that claimants must submit proof of actual injury in § 1983 claims). The workers' request for punitive damages creates the same problem. Although they allege a broad pattern or practice of discrimination by DeCoster, a punitive damage award would necessarily relate both to the reprehensibility of DeCoster's conduct and to the compensatory damages awarded to each plaintiff. *See Allison*, 151 F.3d at 417–18; *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 580, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 207 (1st Cir.1987) (stating that punitive damages must relate to the character of the defendant's act and the nature and extent of harm to the plaintiff), *overruled in part on other grounds by Iacobucci v. Boulter*, 193 F.3d 14, 27 (1st Cir.1999). Each plaintiff may have been affected in substantially different ways depending on such factors as the length and dates of employment, the type of employment, who his/her supervisor was, and the specific housing the worker lived in.

Therefore, certification under Rule 23(b)(2) is inappropriate.

### (b) Fed.R.Civ.P. 23(b)(3)

To certify a class under Rule 23(b)(3), a court must find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to all other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Subdivision (b)(3) specifically applies to those cases "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed.R.Civ.P. 23 advisory committee notes. The plaintiffs claim that the question whether DeCoster follows a discriminatory pattern or practice is common to the entire class and predominates over any individual questions—especially if I accept their proposal to bifurcate the trial into a trial on liability and a subsequent trial on damages. Phase 1 on liability, they say, would thereby avoid the emphasis on the individual that becomes necessary to establish entitlement to monetary damages. *See* Pls.' Reply at 7.

■ I conclude that even if I were to bifurcate, the issues to be tried involving this class would be unmanageable. I observe that the workers do not necessarily satisfy the requirement that questions of law or fact predominate merely by alleging a pattern or practice claim. *See General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified"). The plaintiffs do not claim that each worker was affected by the alleged discriminatory practices in the same manner. Instead, the workers wish to certify a class that could consist of potentially 1,000 members, *see* Pls.' Mot. for Class Cert. at 21,[2] who worked for different durations, in different positions, in different barns or plants, with different supervisors, and lived in different trailers and bunk houses over the course of six to seven years. Rather than focus on a discrete practice by DeCoster, the workers instead claim that DeCoster "had a standard operating procedure of targeting Mexican workers so that they could avoid complying with minimum federal standards designed to ensure the most basic health and safety in order to gain a competitive advantage and save a buck." Pls.' Mot. for Class Cert. at 18–19. DeCoster allegedly manifested this "standard operating procedure" through subjective decision-making, discriminatory decisions regarding job performance standards, housing and access to medical treatment, and the maintenance of a racially hostile environment. *See* Am.Compl. at ¶ 31. Because each worker's exposure to this subjective decision-making and hostile environment will vary in nature and degree, any trial on "class" issues will quickly erode into a series of individual trials focused on issues specific to each worker.[3] Further, if the "subjective decision-making" involves job placement, which the workers emphasize in their pattern or practice evidence, this claim also quickly devolves into individual-specific inquiries. For the discrimination issue is not only whether particular individuals were assigned to certain jobs, but also whether there were other jobs available, what positions the work-

---

**2.** According to the plaintiffs' review of DeCoster's employment records, 1,034 people with Hispanic surnames worked at DeCoster's farm between 1990 and 1996. *See* Pls.' Opp'n Mem. at 11. While not all of these workers qualify as workers of Mexican descent who worked within the statute of limitations period, it seems clear that the proposed class exceeds several hundred. *See* Am.Compl. ¶ 28.

**3.** Contrary to the workers' assertions, I may probe beyond the pleadings to determine whether the requirements of Rule 23 have been satis-

fied. *See, e.g., Falcon,* 457 U.S. at 160, 102 S.Ct. 2364 ("Sometimes the issues are plain enough from the pleadings ... and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question"); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) ("The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits") (citation omitted).

ers applied for, and whether there were reasons other than the workers' race for the particular job assignment. *Cf. Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir.1997) (finding that the plaintiffs' claim of a discriminatory pattern or practice of room assignments requires distinct case-specific inquiries). The workers' broad pattern or practice claim simply does not satisfy the "predominance" requirement in this instance.

■■■■ The workers respond that any concerns can be addressed by having individualized damages tried after a class action trial on liability. For support, they cite *Teamsters*, where the Supreme Court instructed that a trial court faced with a pattern or practice claim should conduct a two stage trial: an initial "liability" stage in which the plaintiffs attempt to establish liability for a pattern or practice of discriminatory conduct and, if they are successful, an additional "remedial" stage. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 360–62, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). During the "remedial" stage, each individual must establish that she was affected by the defendant's discriminatory pattern or practice with the burden of persuasion then shifting to the defendant to demonstrate that the individual was denied an opportunity for lawful reasons. *Id.* at 362, 97 S.Ct. 1843. But *Teamsters* was a non-jury case. Even if the *Teamsters* approach satisfied me that the questions of law

or fact common to the class would predominate in this instance (it does not), it would be impractical to require a single jury to weigh all of the proof within the liability stage and then apply the presumption, if so established, to each of potentially 1000 individual workers' damage claims thereafter.[4] In order to establish compensatory and punitive damages, the jury would need to make individualized determinations of the extent and type of harm suffered by each worker—in a context where the named plaintiffs worked during different years, at different jobs, with different supervisors, received and needed different medical treatment, and lived in different trailers or housing. Thus, the predominance of individual issues ultimately to be tried to a single jury in Phase 2 lessens any potential superiority the class mechanism could have in resolving this case. *See Allison*, 151 F.3d at 419–20; *cf. Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n. 19 (5th Cir.1996) ("The greater the number of individual issues, the less likely superiority can be established").

The workers have chosen to claim compensatory and punitive damages and to demand that a jury assess them. In that context, I find the reasoning of *Allison* persuasive and conclude that 23(b)(3), like 23(b)(2), certification is inappropriate on the discrimination claims.

4. There is no avoiding the single jury requirement. The Seventh Amendment permits bifurcation of issues to separate juries only when those issues are so distinct and separable that the second jury will not be called upon to reconsider findings of fact by the first. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 750 (5th Cir.1996); *Gasoline Products, Inc. v. Champlin Refining Co.*, 283 U.S. 494, 499–500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) (holding that the sole issue of damages arising from a breach of contract could not be submitted to a second jury because this issue was so interwoven with the first jury's determination of liability regarding when that breach occurred); *cf. Aetna Casualty Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1567–68 (1st Cir.1994) (rejecting a Seventh Amendment bifurcation claim because the damages could be established as a matter of law in the sense that the second jury "could come to but one determination as to the amount of damages to be awarded under the jury's findings on liability"). Under *Teamsters*, an employer in the

remedial stage may rebut the inference of discriminatory job placement by showing that (1) the individual worker was not qualified; (2) the worker who received the job was of the same race; or (3) there was no job opening other than that which the worker received. All of this rebuttal evidence would revisit the determination of liability: the jury would need to re-weigh the evidence establishing the presumption of liability against the employer with the evidence rebutting that presumption. *See* Keith R. Fentonmiller, *Damages, Jury Trials And The Class Action Under The Civil Rights Act of 1991*, 12 Lab.Law. 421, 441–42 (1997). Only the same jury could do that. If the employer were to fail to rebut the presumption, damages would nevertheless depend on whether discrimination was the proximate cause of the worker's emotional pain and loss of enjoyment of life, which would necessarily entail the second jury revisiting the extent of the harm of the discriminatory act. *See id.* at 442. Again, only the same jury could do that.

## 2. MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT CLAIMS

The workers also seek class certification for their AWPA claims. The workers allege that DeCoster violated their rights under the AWPA by providing unsafe and unsanitary housing. *See* Am.Compl. ¶ 62. They also allege that DeCoster misrepresented or failed to post the terms and conditions of their employment. *See id.* Later in this opinion, I conclude as a threshold matter that the work involved in processing eggs is ineligible for protection under the AWPA. I therefore **DENY AS MOOT** the workers' motion for class certification as to the AWPA claims.

■ Although Rule 23(c)(1) provides that a court shall determine whether a class should be maintained "as soon as practicable," several Circuits have permitted trial courts to decide a motion for summary judgment prior to ruling on a certification motion. *See, e.g., Christensen v. Kiewit–Murdock Investment Corp.,* 815 F.2d 206, 214 (2d Cir. 1987) (finding the district court's deferring decision on class certification until after ruling on the motion to dismiss was appropriate given the breadth of the class plaintiffs sought to certify); *Floyd v. Bowen,* 833 F.2d 529, 534–35 (5th Cir.1987) (trial court did not abuse discretion in denying class certification because it found against named plaintiffs on the merits); *Marx v. Centran Corp.,* 747 F.2d 1536, 1552 (6th Cir.1984); *Wright v. Schock,* 742 F.2d 541, 544 (9th Cir.1984) ("It is reasonable to consider a Rule 56 motion first when early resolution of a motion for summary judgment seems likely to protect both the parties and the court from needless and costly further litigation"); *Postow v. OBA Federal Sav. and Loan Ass'n,* 627 F.2d 1370, 1382 (D.C.Cir.1980) (noting that the rationale for precluding post-judgment certification disappears if the defendant moves for summary judgment before a decision on class certification).[5] In this case, DeCoster moved for summary judgment on all counts before certification was addressed. Further, this is not a case in which there is a danger

of a "one way intervention," *i.e.,* allowing members of a Rule 23(b)(3) class the option of joining an action after a favorable judgment on the merits while avoiding any res judicata effects of an unfavorable ruling. *See* Fed.R.Civ.P. 23(c)(3) advisory committee notes; *Postow,* 627 F.2d at 1381–83. Accordingly, the workers' motion to certify the class under the AWPA claims is moot in light of my ruling on the AWPA claim.

## 3. FRAUD AND BREACH OF CONTRACT CLAIMS

On behalf of themselves and members of their class, the workers allege that DeCoster breached a contract to provide free housing. They assert that DeCoster also defrauded them by failing to provide decent or safe housing and by failing to provide free transportation to the DeCoster farms as promised. The workers request compensatory and punitive damages for their fraud claims and compensatory damages for their breach of contract claim.

■ These fraud and breach of contract claims do not meet the commonality and typicality requirements of Rule 23(a). *See, e.g., DeGrace v. Rumsfeld,* 614 F.2d 796, 810–11 (1st Cir.1980). Breach of contract claims are, by definition, fact-specific to each individual, for in each instance the trier of fact must determine whether there was a promise, a contract, and, if so, what its terms were and whether it was breached. The fraud claims also require individualized determinations of whether there was a material misrepresentation to each worker, made with a specific intent to induce her to act, and whether she justifiably and detrimentally relied on that misrepresentation. These claims are inappropriate for class certification. Moreover, because I grant summary judgment as to each worker's individual fraud and contract claims, they are not proper representatives of the class if one were to be certified.

Therefore, I **DENY** the motion for class certification in its entirety.

## B. MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT CLAIMS

The workers claim that DeCoster violated the Migrant and Seasonal Agricultural Worker Protection Act by providing unsafe and unsanitary housing.[6] Because I conclude that the workers are neither "migrant agricultural workers" nor "seasonal agricultural workers" entitled to protection under the AWPA, I **GRANT** DeCoster's and Maine AG's motion for summary judgment on this claim.

■ The workers claim that they are "migrant agricultural workers," entitled to benefits under the AWPA. 29 U.S.C. § 1801 et seq. (1983). The statute defines the term "migrant agricultural worker" as meaning "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A). I will assume that the egg processing business that DeCoster and the related companies engage in is "agricultural employment,"[7] and that these workers are "absent overnight from [their] permanent place of residence," which is primarily in Texas, Mexico and a number of Central American and Caribbean countries. The only real dispute, then, is whether their agricultural employment is "of a seasonal or other temporary nature."

The Secretary of Labor is charged with enforcement of the Act, and under *Chevron* I must give deference to her interpretations of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Secretary of Labor has defined "seasonal or other temporary basis" in two parts.

As to "seasonal" work, "[l]abor is performed on a seasonal basis where, ordinarily; the employment pertains to or is of the kind exclusively performed at certain seasons or periods of the year and which, from its nature, may not be continuous or carried on throughout the year." 29 C.F.R. § 500.20(s)(1) (2000). The undisputed facts on this summary judgment record keep the egg processing business outside that definition. The egg business operates year-round, has no slack season, and is continuous.[8]

As to "temporary" work, the regulations provide: "A worker is employed on '*other temporary basis*' where he is employed for a limited time only or his performance is contemplated for a particular piece of work, usually of short duration. Generally, employment, which is contemplated to continue indefinitely, is not temporary." 29 C.F.R. § 500.20(s)(2). The workers do not dispute that DeCoster employees were hired on an at-will basis for an indefinite duration. *See* Pls.' Statement of Disputes ¶¶ 11–12. Many of the workers, however, consider themselves temporary workers because they frequently left DeCoster to perform other temporary agricultural work and then returned to DeCoster. But that circumstance was not due to the nature of the work. Instead, the work was available on a permanent basis and was not for a particular task that would be of short duration. The workers' subjective intent and the decisions they make as to how long they will stay employed cannot be the rule of decision for coverage of "temporary" work under the Act. Not only can no employer ever be confident of its employees' intentions as to permanent employment, but more importantly, the statute and the regulations direct our attention to the nature of the *work*, not the employee's intentions ("agricul-

---

6. That housing was the subject of numerous Occupational Safety & Health Administration ("OSHA") citations for willful violations of federal health and safety regulations. *See* OSHA Citation and Notification of Penalty, Citation 2, Items 38–78 (Jul. 12, 1996). DeCoster does not in this litigation contest the existence of these violations or the deplorable living conditions the workers have described.

7. Although Maine AG argues that it is not an "agricultural employer" as defined under AWPA, I need not decide that claim in light of my ruling that the workers do not qualify for protection under that Act in any event.

8. The workers do not dispute that the nature of the work at DeCoster is continuous, on-going, and year-round without a slack period. *See* Pls.' Statement of Disputes ¶¶ 8–15.

tural employment of a seasonal or other temporary nature").[9]

■ Nor do the workers qualify as "seasonal agricultural workers" under the Act. The statute defines "seasonal agricultural worker" as "an individual who is employed in agricultural employment of a seasonal or other temporary nature and is not required to be absent overnight from his permanent place of residence ... (i) when employed on a farm or ranch performing *field work* relating to *planting, cultivating,* or *harvesting* operations; or (ii) when employed in canning, packaging ... of processing operations, and transported, or caused to be transported, to or from the place of employment *by means of a day-haul operation."* 29 U.S.C. § 1802(10)(A) (emphasis added). On the first criterion, the Secretary defines "field work" as work including all operations "which are normally required to plant, harvest or produce agricultural or horticultural commodities, including the production of a commodity which normally occurs in the fields of a farm or ranch as opposed to those activities which generally occur in a processing plant or packing shed." 29 C.F.R. § 500.20(r)(ii). This regulation does not cover egg processing plants, both because of where such activity occurs and because it involves *animal* commodities. The second criterion is also inapplicable. These workers are not day-haul workers because they do not assemble at a pick-up point waiting to be hired as required under 29 U.S.C. § 1802(4).

I address two other points before leaving the AWPA claim. First, to the average layperson, these workers are "migrant workers." After all, many of them come from other countries to engage in agricultural-related activities, and they maintain their permanent homes in or allegiances to those countries. But it is up to Congress to determine what categories of workers deserve protection. Here, Congress has used plain language that simply will not encompass these workers, because their work is neither seasonal nor temporary. Congress could have left those limiting criteria out of the Act and extended its protection to any employee who engaged in agricultural-related labor and who left his home to be so engaged, but Congress chose not to.[10] The statutory language is clear and must control.

Second, there is some limited caselaw that might be read contrary to what I have decided. The only case from the Circuit level, *Caro–Galvan,* interpreted the Act broadly in the context of its application to a year-round fern growing operation. *Caro–Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500 (11th Cir.1993). But in doing so, the Eleventh Circuit pointed out that fern growing actually was seasonal, and that the workers there had year-round work only because the employer found other jobs for them to do in the business during the off-season. *Id.* at 1508–09. Thus, *Caro–Galvan* can be read consistently with the plain language of the statute. Another case, *Castillo,* from the Western District of Texas, simply cannot be squared with the Act's language. *Castillo v. Case Farms of Ohio, Inc.,* 48 F.Supp.2d 670 (W.D.Tex. 1999). The judge there understandably was concerned with the atrocious conditions suffered by the workers and extended the Act's

---

9. *See* Opinion Letter No. 1575 (WH–522), [Wages–Hours 1981–1987 Tr. Binder] Lab.L.Rep. (CCH) ¶ 31,440, at 43,760 (Apr. 23, 1984) ("it is the nature of the work rather than the duration of the employment which controls").

10. Indeed, there is some legislative history that suggests that some members of Congress thought that previous legislation had been interpreted too broadly in its coverage. AWPA's predecessor, the Farm Labor Contractor Registration Act, defined a migrant worker as "an individual whose primary employment is in agriculture, as defined in section 203(f) of title 29, or who performs agricultural labor, as defined in section 3121(g) of title 26, on a seasonal or other temporary basis." 7 U.S.C. § 2042(g) (repealed 1983).

Rep. Panetta, one of the sponsors of AWPA, co-sponsored a bill to limit the definition of "migrant worker." Citing his "shock" that " 'migrant worker' no longer means migrant worker[; it] is now interpreted by the Labor Department to mean any employee who is performing agricultural work," Rep. Panetta proposed a limiting definition to "migrant worker" substantially similar to that found in AWPA. 127 CONG REC. H10353, 10354–55 (daily ed. May 20, 1981) (statement of Rep. Panetta); H.R. 3636, 97th Cong. § 8 (1981) ("The term 'migrant worker' means an individual who is engaged in agricultural employment on a seasonal or other temporary basis and who cannot regularly return to his or her domicile each day after working hours").

protection to them notwithstanding its language. I respectfully disagree with the opinion. I equally abhor what these workers apparently have suffered in this case, but I can give them only the protection that Congress has provided.

## C. FRAUD AND BREACH OF CONTRACT CLAIMS

Discovery has closed, and the workers have not met their summary judgment burden under *Celotex* on either their fraud or breach of contract claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The workers allege that DeCoster breached its contract to provide free and sanitary housing[11] and free transportation to the farm, and that DeCoster fraudulently misrepresented the conditions of the housing provided to them and the cost of the transportation provided to them. But the workers have offered no facts to show that a DeCoster agent made any such contractual commitment or false representation to them.

### 1. FREE HOUSING

Although DeCoster concedes charging some rent between October 1995 and March 1996, *see* Defs.' Mot. for Summ.J. at 4, the plaintiffs present no evidence that they were charged rent during their stays at DeCoster. The workers never offer evidence that Jose and Esther Hernandez paid rent for a trailer nor that the Hernandezes lived at DeCoster during the October 1995 to March 1996 period. *See* Pls.' Statement of Disputed Fact ¶¶ 84–91. Neither do they offer evidence that Luis Ramirez paid rent. *See* Pls.' Statement of Disputed Fact ¶¶ 97–105.[12] (Luis Ramirez began working at DeCoster in December 1996. *See* Pls.' Statement of Disputes ¶ 216). For the remainder of the named plaintiffs present during the statute of limitations period, the plaintiffs do not dis-

pute DeCoster's contention that they did not pay rent. *See* Pls.' Statement of Disputes ¶¶ 36 (all other employees who did not live in DeCoster housing from October 1995 through March 1996 lived rent-free), 51 (E.Elizondo), 55 (M. Elizondo lived with her husband), 95 (Garcias), 140 (L.Garcia), 208 (Portales), 269 (Romo). Therefore, summary judgment is **GRANTED** as to this portion of the workers' fraud and contract claims.

### 2. FREE TRANSPORTATION

The summary judgment record shows that Duke Goranites, a DeCoster supervisor, completed a Department of Labor form that affirmatively represented that transportation was free. The named plaintiffs, however, have no evidence that they personally were promised free transportation nor that they ever saw or relied upon the Department of Labor form; rather, the ones who discussed transportation learned that they would receive a loan for transportation.[13] The only plaintiff directly promised free transportation, Luis Ramirez, was told by an employment agency that transportation would be free. *See* Defs.' Statement of Undisputed Material Facts at ¶ 219. The workers point to no evidence, however, that he repaid the transportation funds provided to him. *See* Pls.' Statement of Disputed Fact ¶¶ 97–105; Defs.' Statement of Undisputed Material Facts ¶¶ 216–242; Pls.' Statement of Disputes ¶¶ 216–242; Pls.' Opp'n Mem. at 25–36, 45–47; Defs.' Mot. for Summ.J. Against Luis Ramirez ¶ 13. Thus, the workers have not raised a genuine issue of fact regarding their claims that DeCoster fraudulently induced them to enter into employment relationships through its promise of free transportation. I **GRANT** DeCoster's motion for summary judgment as to this portion of the workers' fraud and contract claims.

---

11. Although the workers do not claim a contract for sanitary housing in their amended complaint, in their opposition memorandum they argue that DeCoster impliedly promised sanitary housing. *See* Pls.' Opp.Mem. at 45–46.

12. Because of the voluminous record in this case, the parties must comply with the provisions of Local Rule 56(e) ("The court shall have no

independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts").

13. *See, e.g.,* Pls.' Statement of Disputes ¶ 117 (L.Garcia); Pls.' Statement of Disputed Fact ¶ 88 (Jose Hernandez).

### 3. SANITARY HOUSING

Therefore, the only issue remaining under the workers' fraud and breach of contract claims is whether DeCoster promised that its housing would be sanitary. I proceed to consider written, oral, and implied representations.

#### (a) Written Statements

Although DeCoster required its workers to fill out applications and, in some instances, contracts, the workers have not demonstrated that DeCoster made express promises regarding the conditions of the housing in either. The only written employment contract either side has submitted, that of Dora Garcia, lists (in English and Spanish) only the type of employment, the starting salary, the indefinite duration of employment, and that housing, but not transportation, is free. Nothing in that contract specifies any other terms or conditions of employment or housing. Therefore, there are no actionable written statements.

#### (b) Oral Statements

 The workers point to only a few admissible facts to support their theory that DeCoster, through its agents, promised sanitary housing. Many claim that their relatives, non-supervisory employees at DeCoster, made promises regarding conditions at DeCoster, but they have offered no facts to demonstrate that these workers were acting on behalf of DeCoster or within the scope of their employment at DeCoster when they made these statements. They do claim that these relatives were reporting what Homer Ramirez—a DeCoster supervisor responsible for recruitment—told them. They have advanced these assertions, however, not by admissible evidence, but only through hearsay.[14] On summary judgment, only admissible evidence will suffice. *See* Fed.R.Civ.P.

56(e). Indeed, within the six-year limitations period, no worker claims to have spoken with Homer Ramirez or any other DeCoster supervisor or manager regarding the conditions of employment or housing before coming to DeCoster.[15] Thus, any alleged promises the relatives reported are inadmissible hearsay and insufficient to resist summary judgment.

The workers' strongest argument for establishing DeCoster's accountability for contractual commitments or fraudulent statements through a relative is through Jose Hernandez. Jose Hernandez claims that before he returned to DeCoster in January 1989, Homer Ramirez (unquestionably a recruiting agent for DeCoster) told him that he would receive $50 for each person Jose Hernandez brought with him to DeCoster. *See* Jose R. Hernandez Dep. (Apr. 8, 1999) at 113. Dora Garcia claims that in 1994 Jose Hernandez told her that there were jobs available at DeCoster and that they—she and her husband Lauro Garcia—"would live just fine" in reference to housing. *See* D. Garcia Dep. (Feb. 3, 1999) at 7. At that time, however, Jose Hernandez was only a barnman and there is no evidence that he had any authority—actual or apparent—over the provision of housing to the Garcias. Lauro Garcia similarly claims that Jose Hernandez promised him a "larger" "better" trailer if he and Dora returned to DeCoster in 1996. *See* L. Garcia Dep. (Feb. 3, 1999) at 4–5. Jose Hernandez was promoted to crew chief in 1996, a supervisory position within one of the barns. *See* Jose Hernandez Dep. (Apr. 8, 1999) at 73–74, 106–07. But Lauro Garcia testified that, at the time Jose Hernandez made this promise, he thought that Hernandez was working as a barn man, more specifically, as an egg runner. L. Garcia Dep. (Feb. 3, 1999) at 5. The workers do not argue that Hernandez had actual or apparent authority to bind DeCoster.[16] Thus, the Garcias's statements offered

---

**14.** Two workers, Juan and Elda Hernandez, have stated that Homer Ramirez directly promised them a job and a trailer for just them and their family. *See* Juan Hernandez Dep. at 26–27. However, as discussed below, both plaintiffs worked only in 1989 and are thus barred by the statute of limitations.

**15.** The only promises Homer Ramirez allegedly made within the relevant time period were the availability of a job once an applicant reached DeCoster. *See, e.g.,* Defs.' Statement of Undisputed Facts ¶¶ 223–24; Pls.' Statement of Disputes ¶¶ 223–24.

**16.** Although Jose Hernandez's ultimate position of crew chief offers him some supervisory au-

for what Jose Hernandez promised them do not qualify under Fed.R.Evid. 801(d)(2)(D) and are therefore inadmissible.

Thus, there are no admissible actionable oral statements.

### (c) Implied Warranty

The workers assert that by promising housing as incident to employment, DeCoster impliedly warranted that the housing would be sanitary and would comply with OSHA safety standards. The workers do not elaborate upon this assertion and do not·cite any support for this argument.[17] Perhaps their argument is based upon the Law Court's determination that DeCoster's workers are tenants in the employer-provided housing, *see State v. DeCoster*, 653 A.2d 891, 894 (Me.1995), and a corresponding notion that the workers could benefit from an implied warranty. It might seem strange to most people that there should be any question whether rented housing must be sanitary. I must apply state law as I find it, however. Maine has an implied warranty of habitability statute covering solely "dwelling units ... which are *rented* for human habitation," 14 M.R.S.A. § 6021 (West 1980) (emphasis added). But the workers have not argued that this statute is applicable (the named plaintiffs were not required to pay rent), nor have they argued that the notice requirements within that statute should be waived in federal court. By failing to argue for any application of the statute to these workers, the plaintiffs have waived this argument.

Maine's common law also recognizes a limited implied warranty of habitability: although the Law Court generally applies the doctrine of caveat emptor to leases, it has carved out a narrow exception for the lease of a furnished dwelling house for a temporary purpose.[18] *Young v. Povich*, 121 Me. 141, 116 A. 26, 27 (1922). The workers have not even cited *Young v. Povich* let alone argued how it would apply to their circumstances. I observe that there is testimony in the summary judgment record that the trailers had some furnishings. *See, e.g.*, D. Garcia Dep. (Feb. 3, 1999) at 8–9 (double bed); D. Garcia Dep. (Feb. 4, 1999) at 138–40 (mattress), 165 (dining room table). Therefore, the only remaining issue is whether the leases were for a temporary purpose. Unlike the situation described in *Young*, which related to the leasing of short-term seasonal or summer housing, DeCoster's housing was available indefinitely as long as the individual worked at its farms. Thus, the housing was not for a temporary purpose. Although the result is harsh, I conclude that Maine law, as it currently exists, does not recognize an implied warranty here.[19]

Because the workers have not alleged admissible facts supporting the existence of any promise by a DeCoster agent regarding the provision of sanitary housing during the statute of limitations period, they have raised no issue of material fact in support of their opposition to summary judgment. Therefore, I **GRANT** DeCoster's motion for sum-

---

thority, the workers have not offered any evidence that the scope of his duties as crew chief encompassed any authority over the determination of the conditions of the housing or of what housing to provide to new workers. To the contrary, the workers argue that the crew chiefs are "not true supervisors," Pls.' Statement of Disputed Fact ¶ 29, and "[have] no power to hire or fire· workers and [have] no power to make decisions with respect to work assignments." *Id.*

17. Their total argument on this subject is as follows: "When DeCoster told the Plaintiffs ... that housing was included with employment, it must be implied into that promise that housing would comply with the minimums established by OSHA." Pls.' Opp.Mem. at 46.

18. The limited exception expressly does *not* recognize (1) an implied warranty for leases of an unfurnished dwelling (any duration); and (2) an

implied warranty for leases of a furnished dwelling for a period of years. *Young v. Povich*, 121 Me. 141, 116 A. 26, 26–27 (1922).

19. In effect, the implied warranty assertion amounts to a request for an extension of the *Young* rule to furnished housing provided by an employer for an indefinite duration. There is much appeal to the idea. There are two problems, however. First, the workers have neither cited nor argued the applicability of *Young*. Second, a federal court is not the forum to develop an extension of state law. *See Jordan v. Hawker Dayton Corp.*, 62 F.3d 29, 32 (1st Cir.1995) ("litigants who reject a state forum in order to bring suit in federal court ... cannot expect that new trails will be blazed") (citation omitted).

mary judgment as to the named plaintiffs' fraud and breach of contract claims.

## D. INDIVIDUAL 42 U.S.C. § 1981 CLAIMS

### 1. HOUSING

Summary judgment is **DENIED** as to each worker[20] who lived in either a trailer or a bunk house during the six-year statute of limitations period[21] because there is a genuine issue of material fact whether DeCoster discriminated on the basis of race in the conditions of the housing provided to its workers.

Summary judgment is **GRANTED,** however, on any housing discrimination claim regarding the apartments located outside DeCoster Egg Farms. Jose and Esther Hernandez claim that Homer Ramirez placed them in an unsanitary apartment in February, 1991. Jose Hernandez Dep. (Apr. 8, 1999) at 123. Jose Hernandez worked at DeCoster from February, 1991 to July, 1992. *Id.* Jose Hernandez testified, however, that during the last three months of their 1991–1992 stay, they lived in a trailer at the Farm. *See id.* at 125–26. Thus, the Hernandezes did not live in an apartment during the limitations period. Genaro Romo testified that he chose to rent an apartment in Lewiston with three friends but did not testify that any DeCoster manager placed him in that apartment. G. Romo Dep. (May 28, 1999) at 52–54.[22] Although the plaintiffs claim that Homer Ramirez assigned Luis Ramirez an apartment in Lewiston, *see* Pls.' Statement of Disputed Fact ¶ 97, they offer no citation to the record to support that assertion. Even if the workers could establish that a named plaintiff was placed in an apartment owned by DeCoster during the limitations period, the workers have not offered proof that DeCoster provided white workers with better apartments, or even that DeCoster provided white workers with apartments at all.

### 2. JOB PLACEMENT

Summary judgment is also **GRANTED** on the workers' discriminatory job placement or hiring claims. In support of their claim that DeCoster practiced a policy of racially discriminatory job placement, the workers have offered statistical evidence that, they assert, demonstrates that Hispanic workers were more likely to be assigned to "dirty" jobs.

■ Although I have ruled that the workers cannot pursue claims on behalf of a class, they still may use the evidence developed in support of their pattern or practice arguments to bolster their individual claims of disparate treatment by DeCoster. *See Conway v. Electro Switch Corp.,* 825 F.2d 593, 597 (1st Cir.1987); *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 880, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (noting that pattern or practice evidence is relevant on the issue of pretext). However, the workers may not rely *solely* upon their pattern or practice proof to establish individual violations of § 1981.[23] They must still establish liability

20. Edgar Elizondo, Maria Elizondo, Lauro Garcia, Dora Garcia, Jose Hernandez, Esther Hernandez, Isidro Portales, and Genaro Romo

21. 14 M.R.S.A. § 752 (West 1980).

22. Although the plaintiffs claim that Romo lived in an apartment assigned by Homer Ramirez, Pls.' Statement of Disputed Fact ¶ 112, their record citation does not support this claim. *See* G. Romo Dep. at 62–64. Therefore, I do not consider it pursuant to Local Rule 56.

23. To date, the Supreme Court has recognized "pattern or practice" employment discrimination claims in two contexts: (1) when the government brings suit on behalf of a large group of individuals to remedy the regular discriminatory policy or procedure by an employer, *see Teamsters,* 431 U.S. at 360, 97 S.Ct. 1843; and (2) when private individuals bring a class action alleging a pattern or practice of racial discrimination by their employer, *see Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). By contrast, the Supreme Court has never applied the *Teamsters* method of proof to a private, non-class employment discrimination suit. *See Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 761 (4th Cir.1998), *vacated and remanded to reconsider on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999). Further, the Court has distinguished between individual and class actions on numerous occasions. *See, e.g., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252 n. 5, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (noting that the factual issues and the character of the evidence differ between an individual's disparate treatment claim and a pattern or practice suit); *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 575 n. 7,

under the *McDonnell Douglas* framework the Supreme Court elaborated upon in *Burdine. See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

To establish a prima facie case under the *McDonnell Douglas* framework, a plaintiff must show:

> (i) that he belongs to a racial minority; (ii) that he applied for and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected, and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). For each of the named plaintiffs who applied for work during the limitations period, the plaintiffs do not submit evidence as to which positions were open when each individual applied, for which positions the individual was qualified, whether the individual was denied a sought-after position, or whether that position subsequently remained open or was filled by a non-Mexican with similar qualifications.[24] Although the plaintiffs offer some evidence to support a few of the workers' claims, that evidence is insufficient to establish a prima facie case. For example, the workers claim that Edgar Elizondo "was not given a choice of jobs or even an opportunity to apply for any particular jobs, rather Homero Ramirez assigned him a job in the plants." Pls.' Statement of Disputed Fact

¶ 34. However, the cited deposition states only

Q: ... And after you met with your sister, what did you do next?

A: Well, we rested that day because we arrived in the afternoon, and the following morning I filled out an application in the office....

Q: And so you didn't speak with anyone when you filled out the application?

A: No.

Q: And what did you do after doing that that day?

A: They—they put me to work, Homero himself.

Q: So later that day you spoke to Homero?

A: I was taken to plant No. 1 where there was work for me.

E. Elizondo Dep. at 17–18. This excerpt does not indicate that Elizondo applied for any particular position or even desired any particular position. Similarly, the workers claim that Homer Ramirez "ordered" the Elizondos "to fill out applications and get to work." Pls.' Statement of Disputed Fact ¶ 53. However, the cited deposition testimony of Maria Elizondo states, "He [Homer Ramirez] said we could go to the office and we could fill out an application to be able to start work the next day." M. Elizondo Dep. at 10. The plaintiffs offer no further evidence regarding either worker's specific job placement claims. The proof offered simply does not support the establishment of a prima facie case. Therefore, summary judgment is **GRANTED.**

98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (same); *Teamsters*, 431 U.S. at 358 & n. 44, 97 S.Ct. 1843. An individual in a non-class action is not litigating a common question of fact, but rather a specific question of whether his employer discriminated against him in the particular instance alleged. *See Cooper*, 467 U.S. at 876, 104 S.Ct. 2794 ("The inquiry regarding an individual's claim is the reason for a particular employment decision, while 'at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking' "); *Lowery*, 158 F.3d at 761.

24. *See, e.g.*, E. Elizondo Dep. at 89; Pls.' Statement of Disputed Fact ¶¶ 58–64 (D.Garcia); Pls.'

Statement of Disputed Fact ¶ 66 (L.Garcia) (concerning events prior to 1992); Pls.' Statement of Disputed Fact ¶¶ 65–72 (L.Garcia); Pls.' Statement of Disputed Fact ¶ 84 (Jose Hernandez) (concerning events prior to 1992); Pls.' Statement of Disputed Fact ¶¶ 85–88 (Jose Hernandez); Pls.' Statement of Disputed Fact ¶¶ 89–91 (Esther Hernandez); I. Portales Dep. (Feb. 8, 1999) at 28 (asked to be moved to a new job and was transferred to a new position in which he worked for a long time); I. Portales Dep. (Feb. 9, 1999) at 180 (never applied for a promotion or a higher paying job); Pls.' Statement of Disputed Fact ¶¶ 106–13 (Romo); Pls.' Statement of Disputed Fact ¶¶ 97–105 (L.Ramirez).

### 3. PAY DISPARITIES OF NEW HIRES ON THE BASIS OF RACE

To establish a *prima facie* case of intentional racial discrimination in the provision of pay, a plaintiff must demonstrate that she is a member of a protected class, and that she was paid less than workers of a different race for work requiring substantially the same responsibility, effort, and skill under similar working conditions. *See, e.g., Rowlett,* 832 F.2d at 202; *Pittman v. Hattiesburg Mun. Separate Sch. Dist.,* 644 F.2d 1071, 1074 (5th Cir. Unit A May 1981); *Austin v. Ford Models, Inc.,* 149 F.3d 148, 153 (2d Cir.1998); *cf. McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 298 (1st Cir.1998) (Equal Pay Act claim). It is unclear whether the workers are asserting a differential pay argument. Although their complaint does not specifically refer to racial differences in pay, *see* Am.Compl. ¶¶ 23–55, the plaintiffs make passing references in their opposition memorandum and statement of facts that white workers were paid more than Mexican workers.[25] Their sole factual support for this claim is the "Jenkins Affidavit," which includes a 40+–page summary of the wages earned by DeCoster's new hires, listed by job code from 1992 and 1996; DeCoster's payroll records from that time period; and a list of DeCoster's job codes. Rather than point to each worker, that worker's position, that worker's wages, and the wages of white workers who performed work requiring a substantially similar responsibility, effort, and skill under the same working conditions, the plaintiffs compare only the pay of white versus Hispanic workers generally and cite to the entire summary. But the workers are not bringing a disparate impact suit; they are claiming intentional discrimination under section 1981. This summary is entirely insufficient to establish a *prima facie* case of intentional discrimination as to each plaintiff. Further, under Local Rule 56(e), it is improper to refer to the entire summary; a party must point to a specific page or paragraph. Therefore, the workers have not offered evidence supporting each individual plaintiff's claim.[26] Accordingly, summary judgment is **GRANTED** as to all pay claims.

### 4. WORKING CONDITIONS

#### (a) Servando Campos

Because the plaintiffs do not contest summary judgment with respect to Servando Campos's individual claims,[27] I **GRANT** the motion for summary judgment against him.

#### (b) Juan and Elda Hernandez

Both Hernandezes worked only in 1989 and never returned to DeCoster. *See* Defs.' Statement of Undisputed Material Facts ¶¶ 149, 152–154; Pls.' Statement of Disputes ¶¶ 149, 152–154. Thus, any claim they may have had against DeCoster is barred by the six-year statute of limitations. The workers' argue that their statute of limitations period should be tolled. But under Maine law, the appropriate standard for tolling of the limitations period in this case is whether the defendant actively concealed *material facts* and the plaintiffs relied on the

---

**25.** *See* Pls.' Opp'n Mem. at 3 ("Moreover, during this period, significant discrepancies in pay to Hispanic workers, as compared to White workers existed"); *id.* at 13 ("First, DeCoster placed his Mexican recruits in the lowest paying ... positions"); Pls.' Statement of Disputed Fact ¶ 28 ("White workers were paid more at the farm for the same work performed by Mexicans").

**26.** The only worker to allude to any knowledge of pay disparities is Genaro Romo. *See* Pls.' Statement of Disputes ¶ 265 (Romo learned from a friend that pallet workers, a job held almost exclusively by whites, paid more). However, this knowledge was gained solely through hearsay and is therefore insufficient for withstanding summary judgment. In the cited deposition testimony, Romo also states that he saw a white worker's paycheck once. G. Romo Dep. at 30 ("I did see Walter's check once and I think he got paid better"). However, Romo conceded that *he did not know how many hours Walter worked that week. Id.* DeCoster's workers are generally paid by the hour. Without any evidence or even a suggestion that both Walter and Romo worked a similar job and that they worked the same number of hours, Romo's statement is insufficient to establish a prima facie case of discrimination on the basis of pay.

**27.** Pls.' Statement of Disputes at 4 n. 1 ("Plaintiffs do not oppose summary judgment with respect to Mr. Campos' individual claims, with no prejudice to his right to participate as a class member").

defendant's acts and statements to their detriment. *See, e.g., Harkness v. Fitzgerald,* 701 A.2d 370, 372 (Me.1997). The plaintiffs submit a 1992 state court opinion concerning events prior to 1992 and the testimony of a nurse who attempted to visit the farm in 1995 to prove that DeCoster and its agents deliberately isolated their workers from outside legal support. These items may show a denial of access to legal counsel but they do not amount to concealment of material fact. Thus, they do not qualify under *Harkness.* In any event, even if this claim falls within *Harkness,* any intimidation of the Hernandezes would have ended by 1989, the year they left the farm.

### (c) Edgar Elizondo

█ The crux of Elizondo's claim of racial discrimination in the terms and conditions of his employment is that there was a delay in getting him medical help when he was injured and he was forced to return to work while injured without being informed of the existence of worker's compensation. After Elizondo broke his arm at work, his doctor forbade him to return to work. E. Elizondo Dep. at 56–57. Homer Ramirez told Elizondo if Elizondo did not return to work, he would not be paid. *Id.* at 56. Although Elizondo was unable to perform his job while injured, Ramirez told him that he must continue to pull dead chickens from the hen houses and tied a box around Elizondo's waist in which Elizondo was to place the dead chickens. *Id.* at 66. Elizondo was also yelled at by Allen Fletcher, another supervisor, when he told Fletcher he could not perform other functions of his job. *Id.* at 90.

Elizondo later witnessed Fletcher kick the severed fingers of another Mexican worker into a manure pit while that worker waited for an ambulance. *See* Pls.' Statement of Disputed Fact ¶ 51; Defs.' Statement of Disputes ¶ 51; E. Elizondo Dep. at 98–99. Finally, Elizondo claims that Norman Nadeau, another supervisor, shouted at him once. E. Elizondo Dep. at 131–32.[28] However, Elizondo never claims that any supervisor made racially hostile remarks to him. *See* Pls.' Statement of Disputed Fact at ¶¶ 31–52. The plaintiffs do not specify if Elizondo is making a hostile environment or a disparate treatment claim, and they have not offered sufficient proof to withstand summary judgment on either. Although Elizondo certainly worked in a hostile environment, there is no evidence that this was a *racially* hostile environment.[29]

█ Under a disparate treatment analysis, the plaintiffs must establish the existence of a *prima facie* case. While this is burden is not onerous, the plaintiff must offer some showing that gives rise to an inference of discrimination. *See Rowlett,* 832 F.2d at 200 ("in many cases the fact that the member of the protected class was treated differently from other similarly placed employees is enough"); *Mesnick v. General Electric Co.,* 950 F.2d 816, 823 (1st Cir.1991); *Walker v. St. Anthony's Medical Center,* 881 F.2d 554, 558 (8th Cir.1989). In this case, the plaintiffs have demonstrated that Elizondo is a member of a protected group and that he was poorly treated while injured. However, they have offered no evidence to demonstrate that non-Hispanics, when injured, received more immediate medical attention or worker's

---

**28.** Luis Ramirez claims that Norman Nadeau uttered several racial epithets toward him. *See, e.g.,* L. Ramirez Dep. (Feb. 10, 1999) at 150. However, Ramirez worked at DeCoster after Elizondo had left and Elizondo does not claim to have witnessed or been affected by any racist remarks by his supervisors. *See* Pls.' Statement of Disputed Fact ¶¶ 31–52. Further, there is no testimony as to the contents of what Nadeau shouted to Elizondo. E. Elizondo Dep. at 131–32.

**29.** In this case, the workers have portrayed Homer Ramirez as a man who, at the very least, is hostile toward workers in general with a disturbing disregard for their safety. But the workers

have not gone the extra step to show that the hostility is directed toward Mexican workers specifically rather than toward workers generally. As to Allen Fletcher, the workers have not documented other instances of racial discrimination by him. Hostility alone does not create liability under section 1981. The plaintiffs must show some evidence of race-based overtones for this conduct to be a recognized form of race discrimination. *See Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 441 (1st Cir.1997); *McKinney v. Dole,* 765 F.2d 1129, 1137–40 (D.C.Cir.1985), *overruled in part on other grounds, Stevens v. Dep't of the Treasury,* 500 U.S. 1, 7, 111 S.Ct. 1562, 114 L.Ed.2d 1 (1991).

compensation. *See* Pls.' Statement of Disputes ¶ 67. Further, they have offered no proof that other workers, regardless of race, were not forced to work while injured. *See id.*[30] The plaintiffs have offered nothing except the facts surrounding Elizondo's injury. Therefore, summary judgment is **GRANTED** on this portion of Elizondo's claim.

### (d) Maria Elizondo

Summary judgment is **DENIED** on her claim because there is a genuine issue of material fact as to whether she was treated differently on the basis of race in the terms and conditions of her employment.

### (e) Dora Garcia

Summary judgment is **DENIED** on her claim because there is a genuine issue of material fact as to whether she was treated differently on the basis of race in the terms and conditions of her employment.

### (f) Lauro Garcia

Summary judgment is **GRANTED** as to his claim of racially disparate working conditions. In 1994 through 1995, and in 1996, Garcia worked as a railman in Plant 7. *See* L. Garcia Dep. (Feb. 2, 1999) at 82, 107. During that time, Garcia claims that his supervisor had the machines running so quickly that the USDA inspector had to slow them down. *Id.* at 93. Garcia never worked with any white workers when he worked as a railman in plant 7. *Id.* at 82, 106–07. No other plaintiff that worked as a railman during these years (Isidro Portales, Genaro Romo) worked with white workers and neither Portales nor Romo testified that white workers were held to different standards.[31] Thus, the plaintiffs have not established a genuine is-

sue of fact under the first prong of *McDonnell Douglas.*

As a barnman in 1994, Garcia claims that there was only one pair of gloves available in the barn and that he frequently suffered health problems while handling decomposing chickens with his bare hands. L. Garcia Dep. (Feb. 3, 1999) at 55–56. He also testified that the other workers brought their own gloves. *See id.* at 55. Garcia does not submit evidence that DeCoster provided white barnworkers with gloves or that white barn workers were not required to pull decomposing chickens. Therefore, summary judgment is **GRANTED** as to this portion of his claim.

### (g) Jose Hernandez

Summary judgment is **DENIED** on his claim because there is a genuine issue of material fact as to whether he was treated differently on the basis of race in the terms and conditions of his employment.

### (h) Esther Hernandez

▇▇ Summary judgment is **GRANTED** as to her working conditions claim because the plaintiffs do not offer proof of any difference in treatment *on the basis of race. See* Pls.' Statement of Disputed Fact ¶¶ 89–91. The plaintiffs claim that Esther Hernandez was discriminated against because management laughed at her when other workers fought with her in the workplace. *See id.* Although Esther Hernandez was involved in workplace altercations with other workers, those workers were also Mexican. Esther Hernandez Dep. at 5–8. Further, the workers have submitted no proof, nor even claimed, that DeCoster management treated fights between any other workers differently.

---

**30.** The plaintiffs must produce some evidence giving rise to an inference of discrimination, *see Walker,* 881 F.2d at 558 ("in addition to the first three elements of a *prima facie* case, the plaintiff [must] demonstrate that [the adverse employment action] occurred in circumstances which allow the court to infer unlawful discrimination") (internal quotations omitted). Without establishing this inference, the plaintiffs have only established that a worker was treated poorly, and that he also happened to be Mexican.

**31.** Portales began working as a railman at some point during 1992. *See* Pls.' Statement of Disputes ¶ 200; I. Portales Dep. (Feb. 8, 1999) at 25–29. The plaintiffs concede that after 1991, Portales never worked with non-supervisory white workers. *See* Pls.' Statement of Disputes ¶ 212. Genaro Romo worked as a railman for one and one-half months but never worked with any white workers. *See* G. Romo Dep. at 9. Further, the plaintiffs do not offer any evidence of how white railmen were treated at the Farm.

### (i) Isidro Portales

Summary judgment is **GRANTED** as to his claim of disparate treatment in his working conditions because none of the incidents occurred within the limitations period. Portales observed that supervisors put more pressure on Mexican workers than on non-Hispanic workers and that he received equipment inferior to that given to white workers. *See* I. Portales Dep. (Feb. 8, 1999) at 117–20; 122–25. He concedes, however, that the time period that these events occurred and the time period he worked with whites who were not in supervisory roles was between 1989 and 1991. *See id.* at 119, 123; Pls.' Statement of Disputes ¶ 212.

### (j) Luis Ramirez

Summary judgment is **DENIED** on Ramirez's claims of discriminatory treatment in the conditions of his employment, the failure to promote him, the existence of a racially hostile environment, and of retaliation because there is a genuine issue of material fact surrounding all of those claims.

### (k) Genaro Romo

Summary judgment is **DENIED** as to his claim of racially disparate treatment regarding the terms and conditions of his employment because there is a genuine issue of material fact about whether he was forced to work harder than white workers.

## E. CLAIMS AGAINST MAINE AG AND QUALITY EGG

In 1997, DeCoster Egg Farms reorganized its operations into separate businesses and then sold off eight of these new companies to different owners. Austin DeCoster continued to operate the hen houses and hatchery

at the Farm through his sole proprietorship, Maine Contract Farming. John Glessner, an individual who ran various operations for De-Coster in Iowa and served as an unpaid consultant at DeCoster Egg Farms in Maine, started both Maine AG and Quality Egg of New England. Maine AG is a management company that provides employees and administrative support to Quality Egg, which processes, grades, and sells eggs.

### 1. DIRECT CLAIM OF ISIDRO PORTALES

The named plaintiff Isidro Portales worked for Maine AG for only a few weeks in late 1997 and early 1998. Portales does not claim that Maine AG discriminated against him on the basis of race, *see* Portales Dep. (Feb. 9, 1999) at 160–61, and the workers offer no factual allegations that racially discriminatory conduct occurred after he began working with Maine AG.[32] Portales' allegations of poor housing and disparate treatment are solely against DeCoster. *Id.* at 161 ("I only worked a short while for Maine AG. What I do know is with DeCoster I worked for them for a long while and the housing conditions were very old and very worn out"); Portales Dep. (Feb. 8, 1999) at 105–111, 117–20, 122–25.

Because Isidro Portales does not claim that Maine AG discriminated against him on the basis of race or maintained a racially hostile environment, I **GRANT** Maine AG's motion for summary judgment as to his direct § 1981 claims.

### 2. SUCCESSOR LIABILITY CLAIMS AGAINST MAINE AG AND QUALITY EGG[33]

■ The amended complaint never mentions successor liability. In their opposition

---

**32.** Although the plaintiffs claim that Homer Ramirez placed Portales, while he was employed with Maine AG, into an apartment for which he was required to pay rent, *see* Pls.' Statement of Disputes to Maine AG's Statement of Undisputed Facts ¶ 9, they have not alleged any defects with this apartment nor that Portales was told that the apartment would be rent-free.

**33.** While the workers base their argument for successor liability on federal law, they make a passing reference to a Maine case. They do not explain whether or how Maine law should apply

if the case is to be decided on federal grounds. Under Maine's common law, a corporation may be liable for the debts of its predecessor if the new corporation is a "mere continuation" of the predecessor or if the transaction was undertaken with a fraudulent intent to escape liability. *Director of Bureau of Labor Standards v. Diamond Brands, Inc.*, 588 A.2d 734, 736 & n. 5 (Me. 1991). Fletcher notes that the common law fraud exception is merely an application of the law of fraudulent conveyances. *See* 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7125 (Supp.1999). Maine has a Uni-

to the motion for summary judgment, however, the workers argue that successor liability defeats summary judgment as to both companies because there are issues whether (1) DeCoster will be able to satisfy fully any judgment in their favor and (2) the transactions creating the successor companies were "shams" or not "bona fide." *See* Pls.' Opp'n to Maine AG and Quality Egg of New England's Joint Mot. for Summ.J. ("Pls.' Maine AG Opp'n Mem.") at 4–6, 7–10. Although a portion of this argument concerns fraud, which was not alleged with particularity under Fed.R.Civ.P. 9(b), the First Circuit has instructed that inclusion of such an argument within summary judgment motions and related discovery material should be treated as a *de facto* amendment to the complaint. *See Bonilla v. Trebol Motors Corp.*, 150 F.3d 77, 81 (1st Cir.1998). Accordingly, I have considered this argument even though it is difficult to evaluate in the absence of the explicit allegations typically required.

Successor liability is a concept recognized by the Supreme Court for labor relations under the National Labor Relations Act ("NLRA"). Through a series of cases,[34] the Court highlighted the need to protect the labor rights of employees when their employers reorganized: "The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." *John Wiley & Sons*, 376 U.S. at 549, 84 S.Ct. 909. But the Court also emphasized that the public has a strong interest in the free transfer of capital and in permitting a new employer to make necessary changes in the operation of its enterprise. *See Burns*, 406 U.S. at 287–88, 92 S.Ct. 1571. Within the context of labor management relations, the Court established standards for deciding when a corporate successor may be required to arbitrate under a predecessor's collective bargaining agreement or to remedy an unfair labor practice its predecessor committed. *Compare Howard Johnson*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (no arbitration obligation for a successor that acquired only a few employees from the selling company), *with Wiley*, 376 U.S. at 548, 84 S.Ct. 909.

While neither the Supreme Court nor the First Circuit has addressed the issue, several Circuits have held that there may also be successor liability in Title VII employment discrimination cases. *See, e.g., Bates v. Pacific Maritime Ass'n*, 744 F.2d 705 (9th Cir. 1984) (successor must comply with consent decree binding its predecessor); *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir.1974) (successor may be liable under Title VII); *Rego v. ARC Water Treatment Co.*, 181 F.3d 396 (3d Cir.1999) (successor not liable under a "mere continuation" theory within a Title VII case); *Rojas v. TK Communications, Inc.*, 87 F.3d 745 (5th Cir.1996) (successor not liable in Title VII case because predecessor remained viable entity). These courts have reasoned that the considerations that prompted the Supreme Court to hold a successor responsible for a predecessor's unfair labor practices apply to the remedying of unfair employment practices. *See Bloedel*, 503 F.2d at 1090; *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 748 (7th Cir. 1985) (noting that both the NLRA and Title VII "seek to limit an employer's unfettered right to run his business in the interests of protecting an individual employee from arbitrary or discriminatory treatment, and, to a

---

form Fraudulent Transfer Act, 14 M.R.S.A. § 3575 (West Supp.1999), but the workers have not referred to it nor argued that any of its remedies apply to their situation. The Law Court has held that fraudulent conveyances are to be proven by clear and convincing evidence. *See Federal Deposit Insurance Corp. v. Proia*, 663 A.2d 1252, 1254 n. 2 (Me.1995). The workers also have not attempted to satisfy any Maine law on corporate veil-piercing. *See Johnson v. Exclusive Properties Unlimited*, 720 A.2d 568, 571 (Me.1998). By failing to raise and argue these points, the workers have waived these issues.

34. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *Golden State Bottling Co., Inc. v. National Labor Relations Bd.*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *National Labor Relations Bd. v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

lesser extent, to clear the workplace of a 'poisoned atmosphere' resulting from unremedied arbitrary employer action").

Finally, the Seventh Circuit has used the successor liability doctrine in a section 1981 suit, *Musikiwamba,* 760 F.2d at 749, the basis for the claims here.

Applying the doctrine to section 1981 cases is more of a stretch. The NLRA and Title VII emphasize remedies directed at correcting an ongoing management/labor or employer/employee relationship. As the *Musikiwamba* court explained, the "successor doctrine was designed to grant remedial relief—i.e., backpay, reinstatement, or seniority—to an employee who, solely because of a change in ownership, is unable to obtain similar relief from the predecessor." *Id.* at 749. Section 1981, on the other hand, is a damages statute "aimed at rectifying individual acts of discrimination against racial and ethnic minorities ... and it clearly lacks a 'make-whole' purpose." *Id.* at 748. The only way for a plaintiff to recover under section 1981 is to prove intentional discrimination—unlike Title VII, which also encompasses a disparate impact claim.[35] The resulting provision of compensatory and punitive damages for physical and mental humiliation and emotional harm makes victims more than "whole" and punishes actual wrongdoers. *See id.* at 748–49.[36] This focus goes beyond the purpose of the successorship doctrine.[37]

 In this case, all that is sought is compensatory relief for mental humiliation and emotional harm and punitive damages. The workers are not requesting reinstatement or back pay. Therefore, this case does not fall within the purposes or policies of the successor doctrine. Instead, the reference to successor liability is really a request to void a fraudulent conveyance or to pierce the corporate veil. But the workers have not pled or argued either doctrine, and have therefore waived their applications.[38]

## II. CONCLUSION

1. I **DENY** the plaintiffs' motion to certify the class with respect to all claims.

---

**35.** *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) ("Under [Title VII], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices").

**36.** As *Musikiwamba* indicated, the threat of a compensatory or punitive damage award may be an express disincentive to potential purchasers of a corporation. *See id.* at 749.

**37.** It is unclear whether the Seventh Circuit would permit recovery of compensatory or punitive damages under the successor doctrine. In *Musikiwamba,* the Seventh Circuit's reasoning indicated that recovery through successor liability within section 1981 cases should be limited to remedial relief. *Id.* at 748–49. However, the plaintiff in *Musikiwamba* claimed both compensatory and punitive damages in his initial amended complaint, which he later amended to include identical claims against the successor defendants, *see id.* at 743–44, and the court seemed to acknowledge that its test to determine the applicability of successor liability could still be used. *See id.* at 751–53. Later Seventh Circuit opinions, although not section 1981 cases, hint that a compensatory reward may be available. *See, e.g., Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1327 (7th Cir.1990); *Equal Employment Opportunity Comm'n v. G–K–G Inc.,* 39 F.3d 740, 748 (7th Cir.1994).

**38.** If the First Circuit were to apply the *Musikiwamba* analysis, I conclude that the plaintiffs have not satisfied the *Musikiwamba* criteria: (1) notice of the charge or pending suit before acquisition of the predecessor; (2) the predecessor's inability to provide relief; and (3) continuity between the operations and work force of the successor and predecessor so that both companies would reasonably expect the successor to be bound. *See id.* at 750–51. (The final factor subsumes several factors discussed in *MacMillan Bloedel*). While the workers have shown that John Glessner, head of Maine AG and Quality Egg, had notice of the OSHA violations, they have not demonstrated that he knew about the workers' discrimination claims (not filed until almost one year after the reorganization occurred). Further, the workers have not demonstrated that there is an issue whether DeCoster lacks the ability to provide relief. Although DeCoster's property in Turner, Maine is subject to multiple mortgages, the workers have not submitted evidence that DeCoster's property outside of Maine is mortgaged, nor have they submitted any evidence about the total value of DeCoster's assets. Although the workers claim that DeCoster's refusal to disclose the total net value of its holdings itself raises a genuine issue, the workers made no discovery motion to compel this information nor did they offer a proper affidavit pursuant to Fed.R.Civ.P. 56(f). Further, much of the workers' argument concerns the inability of DeCoster to provide relief to potentially 1000 workers. *See* Pls.' Maine AG Opp'n Mem. at 6. However, now that the class claims have been

2. I **GRANT** DeCoster's motion for summary judgment as to the workers' AWPA, fraud, and breach of contract claims. I **GRANT** DeCoster's motion for summary judgment as to the individual workers' claims of racial discrimination in the provision of apartments, job placement, and pay. I **DENY** DeCoster's motion for summary judgment as to the racial discrimination claims in the provision of housing claimed by Edgar Elizondo, Maria Elizondo, Lauro Garcia, Dora Garcia, Jose Hernandez, Esther Hernandez, Isidro Portales, and Genaro Romo. I **GRANT** DeCoster's motion for summary judgment as to the claims of racial discrimination in the conditions of employment claimed by Servando Campos, Juan Hernandez, Elda Hernandez, Edgar Elizondo, Lauro Garcia, Esther Hernandez, and Isidro Portales. I **DENY** DeCoster's motion for summary judgment as to the claims of racial discrimination in the conditions of employment claimed by Maria Elizondo, Dora Garcia, Jose Hernandez, Luis Ramirez, and Genaro Romo. I **GRANT** Maine AG's motion for summary judgment as to Isidro Portales' individual section 1981 and AWPA claims. I **GRANT** Maine AG's and Quality Egg's motion for summary judgment as to the successor liability claim.[39]

So Ordered.

dismissed, the workers have not demonstrated that DeCoster lacks the ability to provide relief to the named plaintiffs if they are successful. Finally, the workers have not presented the "most exceptional circumstances" that would justify imposing successor liability without satisfying the first two factors. *Musikiwamba*, 760 F.2d at 750 ("it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself"). The plaintiffs claim that the defendants' collective refusal to produce unredacted documents detailing the nature of DeCoster's transactions with Maine AG and Quality Egg raises a genuine issue of material fact. Again, the plaintiffs have not sought to compel such information nor offered a proper

39. As a result, the claims remaining against the original defendants in the lawsuit are as follows. Count I: Individual claims of race discrimination by Luis Ramirez, Isidro Portales, Genaro Romo, Jose R. Hernandez, Esther Hernandez, Edgar Elizondo, Maria Elizondo, Lauro Garcia and Dora Garcia against Austin J. DeCoster, d/b/a DeCoster Egg Farm, d/b/a Austin J. DeCoster Company. I have granted summary judgment on Counts II through IV for the original defendants.