**WHEELABRATOR ENVIROTECH OPERATING SERVICES INCORPORATED, Plaintiff, Appellee,**

**v.**

**MASSACHUSETTS LABORERS DISTRICT COUNCIL LOCAL 1144 and Laborers International Union of North America, Defendants, Appellants.**

No. 95–2142.

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1996.

Decided July 10, 1996.

---

Ira Sills with whom Segal, Roitman & Coleman, Boston, MA, was on brief, for appellant.

Benjamin B. Culp, Jr., Atlanta, GA, with whom Steven M. Bernstein, Fisher & Phillips, New York City, Bradford J. Smith and Goodwin, Procter & Hoar, Boston, MA, were on brief, for appellee.

Before STAHL and LYNCH, Circuit Judges and ALDRICH, Senior Circuit Judge.

STAHL, Circuit Judge.

This appeal involves a challenge to a district court's grant of summary judgment vacating an arbitration award. Massachusetts Laborers District Council, Local 1144, ("the Union") seeks reinstatement of an arbitra-

tor's ruling that Wheelabrator Envirotech Operating Services, Inc., breached its collective bargaining agreement with the Union by failing to compel its successor to assume the agreement. Because we hold that the arbitrator plausibly construed the collective bargaining agreement, we vacate the district court's ruling and direct the district court to enter judgment confirming the arbitration award.

## I.

### Background

#### A. Relevant Facts

On October 16, 1980, Envirotech Operating Services, Inc., ("EOS") entered into a contract with the City of Taunton, Massachusetts, ("the City") to take over the operation of the City's waste water treatment plant ("the plant").[1] The parties amended this contract in 1982, renegotiated it in 1985, and amended it again in 1989. The City ultimately allowed this operational contract with the EOS to expire on June 30, 1992. As a condition of its initial agreement with the City, EOS hired a significant number of the City's employees who were then working at the plant. EOS also agreed to recognize the Union as the exclusive bargaining representative for its employees at the plant and to assume the City's collective bargaining agreement with the Union.

Following the expiration in 1982 of this initial bargaining agreement (which EOS had assumed), EOS and the Union agreed to the first in a series of collective bargaining agreements, each lasting three years in duration. The parties negotiated the collective bargaining agreement that is the subject of this appeal (the "CBA") in 1989 and it expired on May 31, 1993, eleven months after the expiration of EOS's operational contract with the City. Each of the three-year agreements contained an identical "successor clause" that provided:

> In the event the operation of the plant, in whole or in part, is assumed by any other entity, public or private, the successor organization . . . shall agree to all terms and conditions of this Agreement unless that assumption in whole or in part would be in violation of legal rights and obligations of the affected employees of the successor organization.

In March 1992—prior to the expiration of EOS's contract with the City—the City solicited proposals to operate the plant. EOS and three other companies submitted bids. The City did not require the bidders to agree to assume the EOS–Union CBA. On June 23, 1992, the City announced that Operations Management International ("OMI") had submitted the winning bid and would assume the operation of the plant effective July 1, 1992. Subsequently, OMI hired a substantial number of employees who had worked for EOS and recognized the Union as the bargaining representative of its employees. OMI, however, refused to assume the EOS–Union CBA.

At a city council meeting on June 30, 1992, EOS implored the City to reconsider its decision to award the contract to OMI. The City declined. During the meeting, OMI confirmed that it did not intend to assume the EOS–Union CBA.

#### B. The Arbitrator's Award

On June 30, 1992, the Union filed a grievance against EOS under the procedure outlined in the CBA, alleging that EOS had breached the CBA by failing to secure OMI's assumption of the CBA. EOS responded that it had no such obligation because, *inter alia*, the successor clause did not apply to a situation in which, as here, no privity existed between EOS and the entity assuming the operation of the plant. On February 24, 1993, an arbitration hearing was convened to resolve the dispute.

Following the hearing, the arbitrator concluded (1) that the language of the successor clause was ambiguous; (2) that the parties intended the clause to require EOS to obligate all successors, even those with which it

---

1. Baker International owned EOS in 1980 when it initially contracted with the City to operate the plant. Baker International subsequently sold EOS to Waste Management International. Ulti-

mately, Wheelabrator acquired EOS several years later and formed the appellee, Wheelabrator Envirotech Operating Systems, Inc.

had no privity, to assume the terms and conditions of the CBA; and (3) that EOS had failed to make any effort to fulfill that obligation with respect to OMI. As a remedy, the arbitrator ordered EOS to make whole its former employees who began working for OMI in July 1992 for all losses in wages, fringe benefits, and other conditions incurred as a result of OMI's failure to assume the CBA. The arbitrator further ordered the parties to offset against the award the value of any relevant benefits agreed to by OMI in its negotiations with the Union or any payments resulting from the settlement of the Union's related grievance against the City.

The Union's grievance against the City focused on the City's failure to obligate OMI to assume the CBA. The City settled the grievance and agreed to pay all former EOS employees the difference between what OMI pays the employees and the amount the employees would have received under the EOS–Union CBA. The City, however, did not agree to compensate the employees for the loss of vacation time and other fringe benefits.

### C. The District Court's Order

Following arbitration, EOS brought this action in federal district court seeking to vacate the arbitrator's award. EOS moved for summary judgment arguing, *inter alia*, that the arbitrator had not plausibly construed the CBA. The Union also moved for summary judgment to confirm the award. In ruling on the cross-motions, the district court upheld the arbitrator's interpretation of the successor clause. Although the court admitted that, as a matter of first impression, it likely would have interpreted the successor clause as applying only to subsequent employers with which EOS had privity, it nonetheless found the arbitrator's interpretation of the clause plausibly based on the language of the CBA. In so holding, the court noted that the arbitrator's interpretation found some support in the Supreme Court's opinion in *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). In *Burns*, the Court implicitly held that a prevailing competitive bidder that hired a substantial complement of the prior employer's workers could be considered a "successor employer" for certain purposes. *Id.* at 277–81, 92 S.Ct. at 1576–79.

The court nonetheless vacated the award, ruling that the arbitrator failed to consider whether EOS could possibly perform its obligations under the successor clause. The court reasoned that the clause was unenforceable because, due to the lack of privity, EOS had no ability to compel OMI to assume the CBA. In short, the district court held that, in failing to consider EOS's inability to perform, the arbitrator manifestly ignored the law of contracts and, instead, pursued an outcome that reflected the arbitrator's own "personal notions of industrial justice." The Union now appeals.

### II.

### *Standard of Review*

We review *de novo* a district court's decision to grant summary judgment vacating an arbitrator's decision. *See Labor Relations Div. of Const. Indus. of Mass., Inc. v. International Bhd. of Teamsters, Local No. 379*, 29 F.3d 742, 745 (1st Cir.1994). In so doing, we are not bound by the district court's rationale but may affirm the ruling on any independently sufficient ground. *Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1446 (1st Cir.1995).

Review of arbitral decisions, however, is extremely narrow and exceedingly deferential. *Service Employees Int'l Union v. Local 1199 N.E., SEIU*, 70 F.3d 647, 651 (1st Cir.1995) (citing *Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria Gastronomica, Local 610*, 959 F.2d 2, 3–4 (1st Cir.1992)); *Maine Cent. R.R. Co. v. Brotherhood of Maintenance of Way Employees*, 873 F.2d 425, 428 (1st Cir.1989) ("Judicial review of an arbitration award is among the narrowest known in the law."). In general, a court reviewing an arbitral decision does "not sit to hear claims of factual or legal error as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). Essentially, a reviewing court should refrain

from intervening in all but the most limited circumstances, those in which the challenger can establish that the arbitrator's award is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact." *Advest, Inc. v. McCarthy*, 914 F.2d 6, 8–9 (1st Cir.1990) (citations omitted); *see also Bettencourt v. Boston Edison Co.*, 560 F.2d 1045, 1050 (1st Cir.1977).

 Specifically, as in this case, when the arbitration concerns the interpretation of a collective bargaining agreement, a court should uphold the view of the arbitrator so long as "it can find, within the four corners of the agreement, any plausible basis for that interpretation." *El Dorado Technical Servs. v. Union Gen. De Trabajadores de Puerto Rico*, 961 F.2d 317, 319 (1st Cir.1992). In other words, an arbitrator may not ignore the plain language of the agreement, but a court need only be convinced that the arbitrator's reading " 'draws its essence from the collective bargaining agreement' " and does not merely rely on the arbitrator's own notions of " 'industrial justice.' " *Misco*, 484 U.S. at 36, 108 S.Ct. at 370 (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). In fine, we should refuse to set aside an arbitrator's decision "unless it can be shown that the arbitrator acted in a way for which neither party could [possibly] have bargained." *Local 1445, United Food & Commercial Workers Int'l Union v. Stop & Shop Cos.*, 776 F.2d 19, 21 (1st Cir.1985) (citing *Enterprise Wheel*, 363 U.S. at 599, 80 S.Ct. at 1362).

### III.

#### Analysis

We divide our analysis into two parts. First, we consider whether the district court erroneously vacated the arbitration award on the basis that the arbitrator improperly failed to consider EOS's inability to compel OMI to assume the CBA. Finding the Union's argument persuasive on that point, we then independently review whether the arbitrator plausibly interpreted the phrase "successor organization" as properly applying to OMI, an entity with which EOS does not have privity.

#### A. Impossibility of Performance

 The Union challenges the district court's conclusion that the arbitrator "manifestly disregarded the law of contracts" by failing to excuse EOS's performance under the doctrine of impossibility.[2] The Union argues that, given the court's finding that the arbitrator plausibly interpreted the successor clause as obligating EOS to assure that OMI would assume the CBA, the impossibility doctrine does not apply to this case. We agree.

 Essentially, the district court held (and EOS contends) that the arbitrator fundamentally erred in failing to recognize that, because EOS exercised no control over OMI or the City, performance of its obligations under the successor clause was impossible. While it may be true that EOS could not possibly have compelled OMI to assume the CBA, that fact, however, is not determinative as to whether the arbitrator should have excused EOS's nonperformance. Excuse under the contract doctrine of impossibility depends not simply on whether performance has become substantially impossible, but also on whether or not the parties reasonably foresaw and allocated the risk that the event or circumstances making performance impossible might occur. *See, e.g., Chase Precast Corp. v. John J. Paonessa Co.*, 409 Mass. 371, 566 N.E.2d 603, 606 (1991) ("The principal question ... remains whether an unanticipated circumstance, the risk of which should not fairly be thrown on the promisor, has made performance vitally different from what was reasonably to be expected."); *see also* E. Allan Farnsworth,

---

**2.** In *Advest*, 914 F.2d at 9, we recognized the "manifest disregard" standard as an alternate, though equally deferential, mode of review applicable to arbitral decisions. We explained that, under this formulation, review "embraces instances where it is clear from the record that the arbitrator recognized the applicable law—and then ignored it." *Id.*

*Contracts* § 9.6, at 715 (2d ed. 1990) ("If a party expressly undertakes to perform, even though performance becomes impracticable [or impossible], impracticability [or impossibility] will not excuse performance, and the party will be liable for damages for nonperformance."). Parties can plausibly assume the risks of events occurring where they know they will not be able to complete specific performance, but will be able to pay damages. The rationale justifying excuse arises only when an unexpected or non-bargained-for event makes performance so vitally different from that which the parties originally contemplated, that the change in performance can be said effectively to have vitiated the consent of the parties.

In this case, once it is assumed that the parties intended the successor clause to apply whether or not privity existed between EOS and its successor, any impossibility argument must fail. If, as the arbitrator found, EOS and the Union intended and contemplated that the successor clause would obligate EOS to assure that any successor would assume the CBA, EOS cannot now complain that performance of that obligation is impossible. In other words, by agreeing to include the successor clause, EOS accepted and bargained for the risk that, if it lost the contract, it would effectively guarantee that its "successor" would assume the terms and conditions of the CBA. As long as EOS clearly foresaw and bargained with the knowledge that it could lose the contract— something we must assume if the arbitrator plausibly interpreted the successor clause— the fact that performance might be impossible if EOS indeed lost the contract is of no moment.

▮ In the alternative, EOS argues that the district court correctly vacated the arbitration award because EOS's failure to perform under the successor clause did not cause the Union's injuries. EOS reasons that the arbitrator held that EOS had breached the successor clause, not because it had failed to compel OMI to assume the CBA, but, instead, because EOS did not even try. Thus, EOS concludes, the arbitrator interpreted the successor clause as imposing on EOS only the duty to make a good faith effort to compel OMI to assume the CBA. EOS then reasons that, because it had no power or leverage to bind OMI (or the City), any attempt to do so would have been futile. In other words, because EOS did not have control over OMI, it could not have persuaded or compelled OMI to assume the CBA and, thus, the Union would have suffered injury whether or not EOS had "performed" under the successor clause (*i.e.,* tried to compel OMI to assume the CBA). Therefore, EOS contends, its breach of the successor clause did not cause any damage to the Union.

Though this reasoning has some force, EOS constructs it (as did the district court) on a false premise. Specifically, EOS reads the arbitrator's interpretation of the duties imposed by the successor clause too narrowly. That the arbitrator recounted EOS's failure even to try to obligate OMI as evidence that EOS breached the successor clause does not necessarily mean that, had EOS attempted but failed to obligate OMI, the arbitrator would have found that EOS had satisfactorily performed. To the contrary, the arbitrator expressly stated in the arbitration award "that the intent of the successor clause was an obligation on the predecessor to *obligate* the successor to assume all terms and conditions of the [CBA]." (Emphasis added.) This unequivocal statement calls for more from EOS than simply a good faith, but unsuccessful, attempt to obligate OMI. Indeed, the fact that the arbitrator awarded damages confirms that the arbitrator read the successor clause as imposing a duty on EOS to succeed in obligating its successor, not simply a duty to try. If not, one would have to conclude that the arbitrator irrationally awarded damages for injuries to the Union that were not causally linked to EOS's failure to perform, and we have found no compelling reason to reach such a conclusion. At bottom, we view the arbitrator's reference to EOS's failure even to try to persuade OMI as, at most, a rhetorical flourish, simply emphasizing the extent of EOS's breach (*i.e.,* not only did EOS fail to compel OMI to assume the CBA, it did not even try).

In sum, the district court erroneously vacated the arbitration award on the grounds

that EOS could not possibly perform its obligations under the successor clause.

### B. Successor Clause

■ As noted, much of our analysis so far relies on the assumption that the arbitrator permissibly interpreted the successor clause as requiring EOS to assure that OMI would assume the CBA. While we acknowledge that the district court ruled favorably to the Union on this point, we are not bound by its holding and may independently review the arbitrator's decision on this issue. *See Carreiro*, 68 F.3d at 1446. Because the issue strikes us as quite close, we now turn to consider it, using *de novo* review. *See Labor Relations*, 29 F.3d at 745. In so doing, we consider first whether the arbitrator's interpretation is consistent with the plain language of the CBA, and, second whether, on the facts of this case, the arbitrator's interpretation is one for which the parties could possibly have bargained. As we have stated, our ultimate task is limited to determining only whether the arbitrator's interpretation of the successor clause "draws its essence from the collective bargaining agreement" and does not merely reflect the arbitrator's own notions of "industrial justice." *Misco*, 484 U.S. at 36, 108 S.Ct. at 370 (internal quotations omitted).

### 1. The Plain Language of the CBA

We begin with the text. In relevant part, the successor clause provides:

> In the event the operation of the plant, in whole or in part, is assumed by any other entity, public or private, the successor organization ... shall agree to all terms and conditions of this Agreement.

We agree with the district court that the arbitrator's interpretation is not inconsistent with the plain language of the successor clause. First, following its successful bid, OMI clearly became an "entity" that had "assumed" the operation of the plant. Next, while one could arguably read the phrase "successor organization" as importing a further restriction on the type of entities covered by the clause (*e.g.*, only those entities in privity with the predecessor), we do not think the text compels that interpretation. To the

contrary, we think one could permissibly read the text "any other entity" that has "assumed" "the operation of the plant" as defining the scope of the phrase "successor organization." Thus, because OMI is an "entity" that has "assumed" the operation of the plant, the arbitrator's conclusion that OMI is a "successor" is consistent with the language of the clause. *Cf. Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees Int'l Union*, 417 U.S. 249, 262 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974) ("There is, and can be, no single definition of 'successor' which is applicable in every legal context.").

Furthermore, as the district court noted, this reading gathers at least some support from the Supreme Court's decision in *Burns*. In *Burns*, the Court effectively held that an entity like OMI—a prevailing competitive bidder that had hired a substantial complement of its predecessor's employees—was a "successor employer," *see Burns*, 406 U.S. at 296, 92 S.Ct. at 1586 (Rehnquist, Burger, Brennan, Powell, JJ., dissenting, describing majority opinion as implicitly premised on the successorship doctrine), and required it to recognize and bargain collectively with the union representing those employees, *id.* at 277–81, 92 S.Ct. at 1576–79. Thus, the application of the term "successor" to an entity that has no direct connection or link to the original employer, *i.e.*, no privity, has some precedent in labor case law. *See also NLRB v. Houston Bldg. Serv., Inc.*, 936 F.2d 178, 180–81 (5th Cir.1991) (subsequent employer who successfully bids for a contract is a "successor employer" with a duty to bargain with union), *cert. denied*, 502 U.S. 1090, 112 S.Ct. 1159, 117 L.Ed.2d 407 (1992); *Systems Mgmt. v. NLRB*, 901 F.2d 297, 301–05 (3d Cir.1990) (similar); *cf. Howard Johnson*, 417 U.S. at 262 n. 9, 94 S.Ct. at 2243 n. 9 ("A new employer ... may be a successor for some purposes and not for others.").

Notably in *Burns*, however, the Court did not require the "successor employer" in that case to assume the obligations of the collective bargaining agreement between its predecessor and the union. 406 U.S. at 286, 92 S.Ct. at 1581. Indeed, the Court declined to do so principally because a complete lack of

privity existed between the successor employer and its predecessor. *Id.* Arguably, such reasoning supports EOS's position that the successor clause in this case should be read narrowly as obligating EOS to require only those "successors" with which it has privity to assume the CBA. Nevertheless, we do not think the reasoning compels such a reading. In *Burns,* the Court analyzed only the obligations of a successor employer arising generally from the National Labor Relations Act. The Court did not, however, focus on the issue addressed here: whether the parties to a collective bargaining agreement could agree to bind a predecessor employer to obligate even a successor with which it lacks privity to assume the terms and conditions of the agreement.

In sum, we agree that the arbitrator's conclusion that OMI is a successor employer is not inconsistent with the plain language of the CBA.

### 2. *The Arbitrator's Own Notions of Industrial Justice*

Notwithstanding our conclusion that the arbitrator's interpretation fits within the text of the successor clause, we decline to end our analysis at this juncture. Instead, we proceed to consider whether, in the context of this case, the arbitrator's interpretation does not merely reflect the arbitrator's own notions of industrial justice. In other words, we consider whether, on the facts presented here, the parties could possibly have agreed that the successor clause obligated EOS to assure that even "privity-less" successors, like OMI, would assume the CBA. *See Stop & Shop,* 776 F.2d at 21 (a court should uphold the arbitrator's interpretation "unless it can be shown that the arbitrator acted in a way for which neither party could [possibly] have bargained").

In so doing, we agree that it *is* arguably doubtful that EOS and the Union could possibly have intended the successor clause to apply in this case, if to have done so necessarily required the parties to read the clause as imposing an obligation on EOS that would both (1) be impossible to perform and (2) expose EOS to a risk of substantial loss for nonperformance. Therefore, we will now consider whether acceptance of the arbitrator's interpretation necessarily requires us to conclude, as EOS contends we must conclude, that the parties read the clause as imposing an impossible obligation on EOS that exposed it to a risk of substantial loss.

### a. *Perception that performance is impossible*

If we accept the arbitrator's interpretation, EOS contends that the parties would have understood the successor clause as burdening EOS with an impossible obligation because they would have recognized that EOS lacked the ability to gain leverage over the City or any successor with which it was not in privity. Thus, EOS would not be able to compel such a successor (or compel the City to require such a successor) to assume the CBA. While the Union concedes this is true with respect to a successor like OMI, it argues that, with respect to the City, the facts before the arbitrator belie the assertion. First, the Union notes that, as part of the City's initial contract with EOS, the City required EOS to assume its collective bargaining agreement with the Union. This suggests, the Union contends, that the City (or at least EOS might have perceived that the City) would have viewed sympathetically a request to impose a similar condition on any future successors. The Union further points out that, when EOS amended and renegotiated its contract with the City, it could have bargained with the City to include in future bid solicitations a requirement that all bidders agree to assume any then existing bargaining agreement between EOS and the Union. The Union also argues that the fact the City has agreed to pay Union members their lost wages following OMI's failure to assume the CBA further suggests that the City would have recognized that it had some obligation to consider the welfare of its former employees.

Though not overly persuasive, these arguments do indeed tend to support the Union's position. EOS responds by pointing out that, in fact, it was unable to persuade the City to require OMI to assume the CBA. However, nothing in the record suggests that EOS ever attempted to persuade the City to

impose such a condition before the June 30, 1992, council meeting, which occurred after the City had awarded the contract to OMI. EOS's inability to persuade the City to impose the condition on OMI in 1992 does not foreclose the inference that EOS may have believed that it could convince the City to impose the condition when EOS originally agreed with the Union to include the successor clause. Moreover, even if EOS perceived that it might not be able to persuade the City to obligate its successor to assume the CBA, EOS could well have assumed the risk of having to pay damages in that situation.

In sum, we do not think that, in accepting the arbitrator's interpretation, we must conclude that the parties necessarily intended to impose an impossible condition on EOS.

### b. Perception of risk of substantial loss

Nor do we believe that the parties necessarily perceived the clause as exposing EOS to a risk of substantial loss. While the arbitrator's interpretation of the clause does effectively make EOS the guarantor of its employees' salaries and fringe benefits in the event it loses its contract with the City, we do not agree that EOS must have viewed the risk associated with that guarantee as so substantial that it never would have agreed to bear it. First, the risk was temporally limited. EOS knew that the clause posed a significant risk only for the period of time that the CBA survived EOS's contract with the City, i.e., eleven months. Second, EOS also knew that, under *Burns*, any successor employer that assumed the operation of the plant and hired a "substantial complement" of EOS's employees would likely be required to recognize the Union and engage in collective bargaining. Hence, if that occurred, EOS's potential liability was limited to the extent that any future agreement between the Union and EOS's successor would be less favorable to the Union than the current CBA. Arguably, if EOS believed it had achieved the best deal possible under the current CBA, it would not have believed that a successor, required to bargain with the Union, would be able to reach a significantly better deal. Finally, EOS would have perceived the risk as substantial only to the extent that it believed that the City would not require a successor employer to assume the CBA or that an arbitrator would enforce the obligation against it.

In sum, as with the argument that the parties must have perceived the successor clause as imposing an impossible obligation, we do not think that, in accepting the arbitrator's interpretation, we must conclude that the parties perceived the clause as exposing EOS to a significant risk of substantial loss. Though as a matter of first impression we might well have decided this case otherwise, given our standard of deference and the ambiguity of contractual language, we cannot say the arbitrator's reading of the successor clause merely reflects the arbitrator's own notions of industrial justice. It is neither inconsistent with the text, nor so improbable that we are convinced that "the arbitrator acted in a way for which neither party could [possibly] have bargained." *Stop & Shop*, 776 F.2d at 21.[3]

## IV.

### Conclusion

For the foregoing reasons, we vacate the district court's grant of summary judgment, and order the court to enter judgment in favor of the Union, confirming the arbitration award.

---

**3.** We also note that the arbitrator found, as a matter of fact, that, in adopting the successor clause, EOS and the Union shared the understanding that the clause bound EOS to compel all successors, even those with which it did not have privity, to assume the CBA. In making this finding, the arbitrator specifically credited and relied on testimony to that effect given by a Union representative who had participated in the negotiations of the initial collective bargaining agreement between the Union and EOS. *See Misco*, 484 U.S. at 37–38, 108 S.Ct. at 370–71 ("Courts do not sit to hear claims of factual and legal error" because it is "the arbitrator's view of the facts and meaning of the contract that [the parties have] agreed to accept."); *Service Employees Int'l*, 70 F.3d at 653.