**Luis RAMIREZ, et al., Plaintiffs,**

v.

**Austin J. DeCOSTER, d/b/a/ DeCoster Egg Farm, et al., Defendants.**

**No. CIV. 98–186–PH.**

United States District Court,
D. Maine.

Oct. 15, 2001.

Harold J. Friedman, Friedman, Babcock & Gaythwaite, Portland, ME, for Luis Ramirez, Servando Campos, Isidro Portales, Genaro Romo Rodriguez, Jose R. Hernandez, Esther Hernandez, Edgar Elizondo, Maria Elizondo, Lauro Garcia, Dora Garcia, Elda Hernandez, Juan Ramon Hernandez.

Timothy J. O'Brien, Verrill & Dana, Portland, ME, Jeffrey A. Schreiber, Schreiber & Associates, P.C., Danvers, MA, John J. McGivney, Rubin & Rudman, LLP, Boston, MA, Kerin E. Stackpole, Bergeron, Paradis & Fitzpatrick, Burlington, VT, for Austin J. DeCoster.

Thomas H. Somers, Kerin E. Stackpole, Bergeron, Paradis & Fitzpatrick, Burlington, VT, for Quality Egg of New England, Maine AG, Maine Contract Farming, LLC.

## MEMORANDUM DECISION ON PENDING MOTIONS

HORNBY, Chief Judge.

The Republic of Mexico and a number of private plaintiffs, migrant workers of Mexican descent, filed this lawsuit on May 18, 1998. Their primary claim was ethnic/racial discrimination by the defendants, owners and operators of an egg farm in Maine. Essentially, the plaintiffs asserted that the DeCoster egg farm purposefully recruited Mexican laborers under false pretenses, prompted them to travel a great distance to Maine, and then discriminated against them onsite in the terms and conditions of employment and housing. The plaintiffs requested certification of a class. *See* Class Action Complaint at 12, 19, 26, 32 (May 18, 1998) (hereafter "Complaint").

On August 9, 1999, I dismissed the Government of Mexico as a party plaintiff. *See Estados Unidos Mexicanos v. DeCoster,* 59 F.Supp.2d 120 (D.Me.1999). Mexico appealed the ruling. On March 31, 2000, I denied class certification on the private plaintiffs' racial discrimination, fraud, and contract claims; I declared moot the request for certification of claims under a federal statute, the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 et seq.

(1994) (hereafter "AWPA"). *See Ramirez v. DeCoster*, 194 F.R.D. 348, 354–55 (D.Me. 2000). On October 11, 2000, the First Circuit affirmed my ruling dismissing Mexico as a party plaintiff. *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332 (1st Cir.2000).

I later learned that just before I issued the rulings of March 31, 2000, the plaintiffs— Mexico included—and some of the defendants had actually entered into a settlement agreement as to all claims. After extensive argument and an evidentiary hearing, I ruled as a matter of federal settlement law that there was, as of February 21, 2000, an enforceable agreement, notwithstanding my later ruling of March 31, 2000 on the merits of part of the dispute. *See Ramirez v. DeCoster*, 142 F.Supp.2d 104, 114–15 (D.Me.2001).

Now, in accordance with the settlement agreement, the plaintiffs want me preliminarily to certify a class for settlement, make a preliminary determination of fairness under Fed.R.Civ.P. 23(e), and approve the distribution of notice to the class in preparation for a final fairness hearing on the settlement. *See* Plaintiffs' Motion for Preliminary Approval of Class Action Settlement at 2 (July 9, 2001). The proposed class under the settlement agreement is: "All current and former Hispanic employees of any of the Defendants and/or their parents, subsidiaries, affiliates, partners, predecessors, successors, principals, agents and assigns who worked at the DeCoster Egg Farm between January 1, 1988 and February 21, 2000." *Id.* The defendants remaining in the case,[1] having lost their argument that they never entered into an enforceable agreement, contend that, as a

result of my March 31, 2000, ruling, a settlement class can no longer be certified; that the plaintiffs therefore cannot perform an essential part of the agreement (binding the class to the compromise through *res judicata*); and that the defendants are therefore excused from performance of their agreement to pay the plaintiffs $6 million in exchange for settlement. *See* Defs.' Opp'n at 8–9. The plaintiffs reply that, although I ruled that the matter could not proceed to trial as a class action, certification of a settlement class is appropriate and the settlement agreement therefore still is possible to perform. *See, e.g.,* Plaintiffs' Brief Pursuant to the Court's September 7, 2001 Procedural Order (Sept. 17, 2001).

The Supreme Court has spoken definitively about the certification of settlement classes. To certify such a class, "a district court need not inquire whether the case, if tried, would present intractable management problems.... But other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). These specifications "focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed." *Id.* at 621, 117 S.Ct. 2231. I must, therefore, analyze the request for certification of a settlement class in light of *Amchem*'s demands.[2] To do so, I must re-

---

**1.** Both parties and the Court for some time have characterized the defendants in terms of the De-Coster defendants (Maine Contract Farming, LLC and Austin J. DeCoster d/b/a DeCoster Egg Farm d/b/a Austin J. DeCoster Co.) and Non-DeCoster defendants (all others). *See, e.g.,* Defendants' Opposition to Plaintiffs' Motion to Approve Class Action Settlement at 8–9 (July 30, 2001) (hereafter "Defs.' Opp'n"); Objections of Non-DeCoster Defendants to Plaintiffs' Motion for Preliminary Approval of Class Action "Settlement" at 1 (July 30, 2001) (listing as the Non-DeCoster defendants all defendants named in the Complaint and Amended Complaint except Austin J. DeCoster d/b/a DeCoster Egg Farm d/b/a Austin J. DeCoster Co. and Maine Contract Farming, LLC). This division reflects their sepa-

rate legal representation. During a Sept. 7, 2001, conference of counsel, I asked counsel for the Non-DeCoster defendants whether or not they wished to be a party to the settlement if my decision enforcing it is sustained on appeal. He responded that they did not. Plaintiffs' counsel acknowledged that they had no grounds for further action against the Non-DeCoster defendants. For purposes of this Decision, therefore, I consider the settling defendants as only Austin J. DeCoster d/b/a DeCoster Egg Farm d/b/a Austin J. DeCoster Co. and Maine Contract Farming, LLC.

**2.** Two of *Amchem*'s important concerns are not present here: this bargain proffered for my approval did have the benefit of adversarial investi-

visit my earlier Order denying class certification when the request was for a class that would proceed to trial.[3]

## ANALYSIS

It should be clear that neither my ruling that the AWPA claim failed, nor the First Circuit's affirmance of my ruling dismissing Mexico as a party plaintiff, is an obstacle to certifying a settlement class[4] and enforcing the settlement. After all, settlements are designed to resolve doubtful claims; doubtful claims (Mexico's status as a party plaintiff and the viability of the AWPA claim were both doubtful at the time of settlement) can go either way. There is no reason to upset the parties' earlier assessment of their respective risks on these issues, notwithstanding the fact that, later, I and the Court of Appeals entered definitive rulings. Indeed, the AWPA ruling still is subject to appeal and therefore still could be vacated.

## RULE 23(a)

I start, therefore, with the specific requirements of Rule 23(a). First, "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The number of workers who potentially are members of the class is in the vicinity of 1,000. *See, e.g.,* 1 Alba Conte & Herbert Newberg, Newberg on Class Actions § 3.05 (3d. ed. 1992) ("In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable ....").[5]

Second, "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2).[6] To state just a few, some of the common questions of fact have to do with the harboring of discriminatory motives by Austin DeCoster and his agents and their ensuing conduct; recruitment techniques the egg farm used; the general conditions in the DeCoster workplace and in the employer-provided housing; rates of pay and pay scales. Common questions of law include the applicability of the AWPA to the DeCoster egg farm operations and these workers from distant states or countries; the elements of common law fraud and contract under Maine law as they apply to migrant labor and temporary housing; and the determination whether DeCoster's treatment of Hispanic employees in the terms and conditions of employment was discriminatory under 42 U.S.C. § 1981.[7]

gation and did arise under the threat of litigation; therefore, I am not being asked to give simply a "gestalt judgment or overarching impression of the settlement's fairness." *Amchem,* 521 U.S. at 621, 117 S.Ct. 2231.

3. The Order of March 31, 2000 denying certification of the class action for trial purposes had several parts. On the fraud and contract claims, I ruled that the defendants were entitled to summary judgment against the claims of the named plaintiffs. *See Ramirez,* 194 F.R.D. at 358. As a result, I ruled that the named plaintiffs were not adequate class representatives to proceed to trial on the fraud and contract claims, and in addition I stated that those claims did not meet the commonality and typicality requirements of the Rule. *Id.* at 355. (I will address later whether those rulings are law of the case that should not be disturbed.) In dealing with the discrimination claims, I focused primarily on the trial management difficulties of the proposed class action, difficulties that are not presented in the settlement. *Id.* at 353–54. On the AWPA claim, I never reached the issue of certifying a class because I found that there was no possible recovery under the statute. *Id.* at 355.

4. Indeed, the AWPA expressly recognizes that class actions may be used to pursue claims under the statute. *See* 29 U.S.C. § 1854(c)(1) (1994).

5. The defendants suggest that statute of limitations questions affect the analysis of this issue, that claims accruing before May 18, 1992, are untimely, that they make the class overbroad and present a conflict of interest for the named plaintiffs in representing the class, and that the class is therefore improper. *See* Defs.' Opp'n at 12, 15. I note first of all that statute of limitations defenses are affirmative defenses that are subject to waiver by a defendant and therefore subject to settlement. They are not inherently defect-creating in the scope of the class or in the scope of the claims that were settled. If there is a serious issue on this score that affects fairness to the class, however, it can be dealt with at the fairness hearing. It certainly does not justify denying preliminary certification.

6. There are also questions that vary from class member to class member. I assess their significance later.

7. The premise for the AWPA claims is the alleged misrepresentations made in recruiting; they are also part of the discrimination, fraud, and contract claims. *See* First Amended Class Action Complaint at 11 ¶ 48 (July 1, 1999) (discrimination) (hereafter "Amended Complaint"); *id.* at 14 ¶ 62 (AWPA), *id.* at 20 ¶ 88 (fraud); *id.* at 26

Third, the "claims ... of the representative parties are typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). The defendants make no serious argument here, and there is nothing about these named plaintiffs that suggests that the nature of their claims against DeCoster is atypical of those of other migrant workers of Hispanic origin.

Fourth, "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4).[8] The defendants concede that class counsel is adequate. *See* Defs.' Opp'n at 15. I reject the argument that the adverse partial summary judgment necessarily makes the named plaintiffs inadequate representatives. *Amchem* teaches that the underlying purpose of the fair and adequate representation requirement is "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231 (citing *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 157–58

n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). The problem in *Amchem* was that one portion of the class consisting of injured plaintiffs wanted immediate payments, while those class members who had been exposed to the toxic substance but were not yet symptomatic wanted funds preserved for the future. *Id.* at 626, 117 S.Ct. 2231. That was a direct conflict of interest, but "[t]he settling parties ... achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Id.* at 627, 117 S.Ct. 2231. That is just not the case here. There is no divergence between the interests of a portion of the class and the named plaintiffs. All want monetary compensation as soon as possible for the treatment DeCoster accorded to his migrant Hispanic laborers. The named plaintiffs are adequate and fair representatives for both the claims that survived my March 31, 2000, ruling and the claims that, but for the settlement, were terminated.[9] The damages on the fraud, contract,

¶ 120 (contract). Even the defendants concede the factual commonality of the various legal theories. *See* Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion to Approve Class Action Settlement at 8 (Sept. 17, 2001) (hereafter "Defs.' Supplemental Opp'n Brief").

8. Of the original fourteen named plaintiffs, Servando Campos is no longer listed as a class representative, and I do not recognize Maricela Diaz and Rigoberto Diaz as class representatives for purposes of this Decision because they were dismissed in part on their own motion. *See* Order on Defendants' Motion for Summary Judgment as to Rigoberto Diaz and on Plaintiffs' Motion for Voluntary Dismissal at 4–5 (May 27, 1999) (dismissing Maricela Diaz and Rigoberto Diaz as lead plaintiffs and granting summary judgment against Rigoberto Diaz on claims for injuries suffered on or before May 6, 1997). No explanation has been given for their reappearance in the First Amended Class Action Complaint. *See* Amended Complaint at 4.

9. On the defendants' demand at or soon after the mediation conference, the plaintiffs agreed to expand the class definition to Hispanic laborers generally. *See Ramirez,* 142 F.Supp.2d at 110–11. Although this expansion of the class was at the defendants' request as part of the settlement agreement, they now argue that it is a defect that permits them to escape the settlement agreement. *See, e.g.,* Defs.' Opp'n at 9 n. 4. Their objection is specious. Classes are often enlarged as part of a settlement process. *See* 2 Conte & Newberg, Newberg on Class Actions § 11.27 ("It

is common for defendants to insist, for settlement purposes, that the scope of class claims be expanded or updated, in order to give defendants maximum protection against further litigation."); *Ridgeway v. Montana High School Assoc.,* 858 F.2d 579, 583 (9th Cir.1988) (noting that the parties expanded the litigation-certified class certified for purposes of settlement). More important, racial or ethnic discrimination need not be so fine-tuned as the defendants would now have it. The discrimination the plaintiffs are asserting that the defendants practiced at the DeCoster egg farm could just as likely be based on Hispanic background as on Mexican origin. The expansion of the class permits Hispanic migrant laborers at DeCoster from other parts of the Western Hemisphere—places like Guatemala, Honduras, etc.—to participate. There is absolutely no reason to exclude them from the class or to conclude that the named plaintiffs of Mexican origin are unable to represent this broader ethnic class of DeCoster workers.

Indeed, during the entire course of this litigation, when referring to the persons allegedly subject to discrimination at the DeCoster farm, both parties have used the terms "Mexican" and "Hispanic" interchangeably. *See, e.g.,* Plaintiffs' Reply to the Defendants Opposition to the Plaintiffs' Motion to Amend Their Complaint at 1–2 (May 10, 1999) (referring repeatedly to the "Hispanic workforce" and "Hispanic workers" who were subject to discrimination); Memorandum of Law in Support of Defendants' Motions for Summary Judgment Against Individual Named Plaintiffs at 3–4 (July 6, 1999) (noting facts disputing any

and AWPA claims (gone but for the settlement) as pleaded are basically the same as the damages on the discrimination claims (still alive).

Are these conclusions inconsistent with my earlier ruling when I denied class certification? *See Ramirez*, 194 F.R.D. at 351. Not as to the discrimination or AWPA claims, for on those claims I did not even address these issues. *See id.* at 351–55. It does appear to be inconsistent, at least in spirit, with my earlier ruling concerning the fraud and breach of contract claims. At that time, I had ruled for different reasons that the federal discrimination and AWPA claims could not proceed as a federal class action, and I therefore had to determine whether the state common law fraud and breach of contract claims would proceed alone as a federal class action. I said "no" for two reasons: first, that on the summary judgment record those claims could not survive at all as to the named plaintiffs and therefore the named plaintiffs could not represent a class litigating those issues; second, that the fraud and contract claims presented alone did not satisfy the commonality and typicality requirements. *See id.* at 355. I now re-examine those two rulings in reverse order.

On commonality and typicality, I was concerned that, if only the fraud and contract claims were proceeding as a class, the predominant inquiries on those more narrow claims would be who said what to whom and when, and that these issues would vary plaintiff by plaintiff. *See id.* at 355. (It would have been better if I had treated this concern under the "predominance" inquiry of Rule 23(b)(3), because clearly the fraud and contract claims had some factual issues in common, and the Advisory Committee notes to Rule 23 explicitly refer to fraud cases as likely candidates for a class action. *See* 28 U.S.C. Appendix, Rule 23(b)(3), Notes of Ad-

visory Committee on Rules–1966 Amendment (1994).) If the lawsuit is to proceed as a class action on the AWPA and discrimination claims, however, then an examination of the overall DeCoster recruiting practices, the on-site employment practices, and the actual housing conditions is inevitable; [10] the individual inquiries as to each particular employee or applicant—whether identical promises or commitments or language were used with each—will remain, but lose their predominance. *See George Lussier Enterprises, Inc. v. Subaru of New England, Inc.*, No. 99–109–B, 2001 WL 920060, at *19, 20, 2001 U.S. Dist. Lexis 12054, at *60–61 (D.N.H. Aug. 3, 2001) (holding that the Rule 23(b)(3) predominance requirement was met for breach of contract claim in part because a certifiable federal antitrust claim would involve the same factual investigation); *Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 164 F.R.D. 659, 666 (N.D.Ill.1996) (holding that the Rule 23(b)(3) predominance requirement was met for common law fraud claim in spite of the need for individual determinations of reliance in part because "the plaintiffs' [claims] arise from the same core of facts as their federal claims"). On adequacy of representation, the named plaintiffs continue to have their fraud and breach of contract claims (for settlement purposes) by virtue of my enforcement of the settlement agreement. The fact that on summary judgment they did not have admissible evidence to maintain their individual claims does not give them the conflict of interest *Amchem* was concerned about. *See Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. In fact, the damages for all these claims are largely the same. Although the named plaintiffs could not proceed to trial as class representatives on the fraud and contract claims, they can proceed to settlement.

difference in the treatment of whites and "Hispanic[s]"); Statement of Undisputed Material Facts in Support of Defendants' Motions for Summary Judgment Against Individual Named Plaintiffs at 5 ¶ 38 (July 6, 1999) (referring to "Mexican and other Hispanic employees" with respect to employment benefits); Plaintiffs' Memorandum of Law in Opposition to Defendant Austin J. DeCoster's Motion for Summary Judg-

ment at 3 (Aug. 16, 1999) (describing in detail the plight of "Hispanic" workers at the DeCoster farm).

10. I recognize the artificiality of this analysis. I am presented with only a settlement class, not a trial class, yet I am talking about what would happen at a trial that will not occur. *Amchem* requires such an approach for the 23(a) factors.

■ If these conclusions are deemed inconsistent with my earlier ruling, then I overrule the earlier ruling.[11] Law of the case neither prevents me from taking that step nor counsels against it for the following critical reason. That earlier ruling still is subject to appeal (whether on an appeal from this ruling or at some later point I leave to the Court of Appeals). If there is a defect in that earlier ruling, it is better taken care of now than later. There is every reason to eliminate any lurking errors. This case is already a procedural nightmare because of the undisclosed settlement.[12]

### RULE 23(b)(3)

■ Turning to Rule 23(b)(3), the question is whether I find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The Rule directs me to four considerations: interests of the class members in individually controlling their own lawsuits; the extent and nature of pending litigation; the (un)desirability of concentrating the litigation here in Maine; and difficulties in managing the class action. *See id.* On the first, there is little interest in individual control of the lawsuit. Each individual claim is relatively modest, these plaintiffs live at great distances from Maine and are not wealthy; some of them have language obstacles. The second and third? the extent and nature of pending litigation and the (un)desirability of concentrating the lawsuit here in Maine—do not cut

in either direction at the moment.[13] Finally, I dispense with the final factor, as *Amchem* permits: since I am considering only settlement, difficulties of managing the litigation disappear. *See Amchem,* 521 U.S. at 620, 117 S.Ct. 2231. Therefore, if these four factors lead in any direction, it is toward class certification.

*Amchem* instructs that the predominance inquiry is concerned with "the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement," as opposed to issues generated by the settlement itself. *Id.* at 623, 117 S.Ct. 2231. Predominance apparently involves comparing the common questions against the "number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions." *Id.* at 624, 117 S.Ct. 2231. I have already indicated the answer in the 23(a) analysis. Here, the common questions predominate: DeCoster's recruiting practices in border states; his use of agents and relatives of workers to recruit other migrant laborers; the promises he made through these agents concerning housing, transportation, and working conditions; the actual working conditions at the DeCoster egg farm, and in DeCoster-provided housing units; how he treated local Maine employees versus how he treated the migrant laborers; pay scales—the list of common questions is almost endless. Are there individual questions? Of course. Presumably not every applicant was told the same thing, since oral statements are involved; not every job or every housing unit was identical; the degree of mistreatment must have varied with the

---

**11.** Initially the plaintiffs moved for reconsideration of the rulings, *see* Plaintiffs' Motion for Reconsideration of the Court's Decision on the Defendants' Motion for Summary Judgment (April 14, 2000), and I denied the motion at a time before I was informed of the enforceable settlement agreement. *See* Order on Plaintiffs' Motion for Reconsideration at 1 (May 11, 2000). The plaintiffs did not request reconsideration a second time following my order declaring the settlement agreement enforceable, *see* Plaintiffs' Brief Pursuant to the Court's Sept. 7, 2001 Procedural Order at 3 n. 2, but for the reasons I explain in text, I have found it necessary to reexamine the ruling.

**12.** Consistent with the effort to bring these procedural matters finally to an end so that this case does not become another Jarndyce and Jarndyce, Charles Dickens, *Bleak House* (1853), I will also analyze below the consequences if law of the case is applied, or if the First Circuit finds that my earlier ruling on the fraud and contract claims' lack of commonality was correct and my current ruling incorrect.

**13.** One could imagine a scenario of these lawsuits being filed in various parts of the country where the plaintiffs may temporarily reside and where DeCoster has sufficient presence to be subject to personal jurisdiction.

superior and the job; and, what concerned me most in my initial ruling, calculation of damages would vary person by person depending on the length of time he/she worked or was housed and when. But balancing the common questions and their significance against the individual questions and their significance, it is undisputable that the common questions of law or fact predominate over the questions affecting only individual members. This is not the "sprawling" settlement class *Amchem* was concerned with. *Id.* at 624, 117 S.Ct. 2231. This is not a case where "individual stakes are high and disparities among class members great." *Id.* at 625, 117 S.Ct. 2231. In the absence of a class action, it is likely that most members of the class will never have any recovery. The common issues predominate, and a class action is the superior method for fair and efficient adjudication.

To recapitulate: *Amchem*'s concern was to protect absentees by blocking unwarranted or overbroad class definitions and to ensure that a settlement class has sufficient unity so that absent class members can fairly be bound. I am satisfied that *Amchem*'s concerns are fully addressed. For charges involving ethnic discrimination, fraud, and breach of contract against migrant workers at a single employment location in Maine, a settlement class of Hispanic workers is an appropriately compact definition, and members of it are fairly bound.

### ALTERNATIVE RULING ON IMPRACTICABILITY

█ Finally, I consider what should ensue if the First Circuit disagrees, and holds instead that the fraud and contract claims lack the necessary commonality and typicality (or indeed that they fail any other part of the class certification requirements), such that the named plaintiffs cannot settle those claims on behalf of the class.

The defendants argue that, if a class cannot be certified as to the fraud and contract claims, they have lost an important part of what they bargained for in the settlement—

namely, *res judicata* effect as to those claims on behalf of the class. If it is now impossible for the plaintiffs to perform that part of the settlement agreement, the defendants say that they may confront defense costs and bad publicity in future lawsuits by individual plaintiffs. *See* Defs.' Opp'n at 8–9. The plaintiffs respond that the fraud and contract claims were an insignificant part of the lawsuit and that the inability to certify those claims should not prevent the settlement from going forward. *See* Plaintiffs' Brief Pursuant to the Court's September 7, 2001 Procedural Order at 7, 12. They point out that at the time of the settlement agreement, the defendants did not even bargain for limiting the number of opt-outs,[14] thus demonstrating their lack of concern over later lawsuits. *Id.* at 11. (The subject of opt-outs came up only after I ordered enforcement and the parties tried to finalize a document.) As a result, the plaintiffs say that the defendants assumed the risk that they might have to confront some or many independent lawsuits and resulting publicity despite the settlement. *Id.* at 11. Finally, the plaintiffs say that my summary judgment rulings make any future lawsuits unlikely. *Id.* at 12. The defendants reply that enforcing the settlement agreement without a fraud and contract class amounts to rewriting it, and that the Supreme Court has held in *Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), that rewriting an agreement is beyond the court's power under Rule 23. *See, e.g.*, Defs.' Supplemental Opp'n Brief at 3.

In *Evans v. Jeff D.*, the defendants proposed a settlement that was attractive to the plaintiffs but that required the plaintiffs' lawyer to surrender any claim for attorney fees. *See Evans*, 475 U.S. at 722, 106 S.Ct. 1531. The plaintiffs accepted the proposed settlement agreement, but after doing so, their lawyer asked the district court to void the portion requiring surrender of his fees. *Id.* at 723, 106 S.Ct. 1531. The district court refused, and the Supreme Court agreed. *Id.* at 723–24, 726, 106 S.Ct. 1531. The Court

---

**14.** Members of a 23(b)(3) class have the right to opt out of the class and bring their own lawsuits.

Fed.R.Civ.P. 23(c)(2).

held that "Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." *Id.* at 726, 106 S.Ct. 1531. In its opinion, the Court cited the Restatement (Second) of Contracts § 184 comment a, which states that "[i]f the performance as to which the agreement is unenforceable [as against public policy] is an essential part of the agreed exchange, . . . the entire agreement [is] unenforceable." *Id.* at 727 n. 13, 106 S.Ct. 1531 (quoting Restatement (Second) of Contracts § 184 cmt. a (1981)). In other words, the principle announced by *Evans* is that a federal court receives no authority to modify settlement contracts from Rule 23; however, contract law doctrine continues to apply unabated.

I turn, therefore, to contract law. I have previously ruled that under First Circuit precedent, enforcement of the settlement agreement is a question of federal law. *Ramirez,* 142 F.Supp.2d at 108–09; *see Quint v. A.E. Staley Mfg. Co.,* 246 F.3d 11, 14 (1st Cir. 2001). Under contract law principles as enunciated by the First Circuit, if I am unable to certify the class as to the fraud and contract claims, it does not necessarily follow that the entire contract is vitiated. According to the First Circuit, "[t]he rationale justifying excuse arises only when an unexpected or non-bargained-for event makes performance so vitally different from that which the parties originally contemplated, that the change in performance can be said effectively to have vitiated the consent of the parties." *Wheelabrator Envirotech Operating Services Inc. v. Massachusetts Laborers District Council Local 1144,* 88 F.3d 40, 45 (1st Cir. 1996) (defining federal contract law impossibility defense in the context of a labor dispute over breach of a collective bargaining agreement); *see United States v. Winstar Corp.* 518 U.S. 839, 895, 904, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (citing approvingly to Restatement (Second) of Contracts § 261 to define the impossibility contract defense un-

der federal law); *accord Twombly v. Association of Farmworker Opportunity Programs,* 212 F.3d 80, 84 (1st Cir.2000) (Under Maine law "[a]n extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance. In such a case the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable." (quoting Restatement (Second) of Contracts ch. 11, introductory note at 309–10 (1981))); Restatement (Second) of Contracts § 184, comment a, p. 30 (1981) (is the performance "an essential part of the agreed exchange"), *cited approvingly in Evans v. Jeff D.,* 475 U.S. at 727 n. 13, 106 S.Ct. 1531.

What I have here—if the First Circuit finds that the fraud and contract claims cannot be certified—is a situation that apparently neither side foresaw: that certification would not extend to the fraud and contract claims and as a result the plaintiffs would become legally unable to perform the full measure of their settlement agreement. Does this justify the defendants in withholding performance in response? In *Wheelabrator's* terms, has performance become "so vitally different from that which the parties originally contemplated" that the contract fails? *Wheelabrator,* 88 F.3d at 45; *accord Twombly,* 212 F.3d at 84.

I conclude that the answer is "no"; the absence of class settlement of the fraud and contract claims does not make the settlement "vitally different"; they were not "an essential part of the agreed exchange." [15] These were *de minimis* claims to start with. Even ignoring my summary judgment ruling that casts serious doubt on the viability of such claims, it is extremely unlikely now that they will ever be asserted by any individuals, given the distant locations of the plaintiffs' residences, the size of any claims and statute of limitations concerns. Moreover, the class recovery on the discrimination and AWPA claims will in large part duplicate the dam-

---

**15.** At oral argument on September 25, 2001, the defendants told me that no development of the record was necessary on this issue.

ages available for the fraud and contract claims such that there will be some indirect res judicata effect in any event. The disappearance of the fraud and contract claims was never a vital part of DeCoster's agreement—as witnessed by his negotiators' lack of concern for how many people might opt out of the class in any event. Instead, DeCoster's major concern, an objective that he is achieving under the settlement agreement, is positive statements from the class and from the Republic of Mexico that he has reformed his operations (he wants his egg markets back and the end of any boycotts), and public dismissal of the discrimination claims. I would enforce the settlement even if the class as certified eliminated the fraud and contract claims. The fraud and contract claims are being used by DeCoster only as an excuse to avoid the settlement agreement now that he has won important parts of the summary judgment ruling.[16]

\* \* \* \* \*

For all these reasons, I now PRELIMINARILY CERTIFY a settlement class under Rule 23(b)(3) for all claims in the Amended Complaint, composed as follows:

> All current and former Hispanic employees of any of the Defendants and/or their parents, subsidiaries, affiliates, partners, predecessors, successors, principals, agents and assigns who worked at the DeCoster Egg Farm between January 1, 1988 and February 21, 2000.

If the Court of Appeals determines that I cannot certify the fraud and contract claims, then I will certify the class as described but without those claims and enforce the settlement agreement accordingly (unless of

---

16. Because *Wheelabrator* and *Twombly* answer the question directly, it is unnecessary to press the analysis further. If further development is considered necessary, Restatement (Second) of Contracts § 267(1) states the applicable principle:

> A party's [here, the plaintiffs'] failure to render or to offer performance may, except as stated in Subsection (2), affect the other party's [here, the defendants'] duties under the rules stated in §§ 237 [sequential performance] and 238 [simultaneous performance] even though the [plaintiffs'] failure is justified under the rules stated in this Chapter [on impracticability of performance].

Restatement (Second) of Contracts § 267(1) (1981). Subsection (2) provides that the rule does not apply "if the other party [here, the defendants] assumed the risk that he would have to perform despite such a failure." Restatement (Second) of Contracts § 267(2) (1981). The Impracticability chapter of the Restatement also has a concluding section 272(2), which provides:

> In any case governed by the rules stated in this Chapter [and thus section 267], if those rules together with the rules stated in Chapter 16 will not avoid injustice, the court may grant relief on such terms as justice requires including protection of the parties' reliance interests.

Restatement (Second) of Contracts § 272(2) (1981).

According to Comment c:

> Under the rule stated in § 204, when the parties have not agreed with respect to a term that is essential to a determination of their rights and duties, the court will supply a term that is reasonable in the circumstances. Since it is the rationale of this Chapter that, in a case of impracticability or frustration, the contract does not cover the case that has arisen, the court's function can be viewed generally as that set out in § 204 of supplying a term to deal with that omitted case. See Introductory Note to this Chapter. Ordinarily the rules stated in this Chapter, coupled with those stated in Chapter 16, will be adequate to allow the court to arrive at a just result (Subsection 1). In some instances, however, these rules will not suffice to avoid injustice. A particularly significant example occurs where the just solution is to "sever" the agreement and require that some unexecuted part of it be performed on both sides, rather than to relieve both parties of all of their duties. This situation differs from that envisioned in § 240, under which the court merely allows recovery at the contract rate for performance that has already been rendered. The question of this Section is whether the court can salvage a part of the agreement that is still executory on both sides. See Illustrations 1, 2, 3 and 4. The rule stated in Subsection (2) makes it clear that it can do so by supplying a term which is reasonable in the circumstances when the rules stated in this Chapter together with those stated in Chapter 16 will not avoid injustice.

Restatement (Second) of Contracts § 272 cmt. c (1981).

I believe the defendants are incorrect in their assertion that § 272 is limited to restitution in cases where one side has already performed. That is the focus of subparagraph (1), *see* Restatement (Second) of Contracts § 272, Reporter's Note (1981), but subsection (2) was a new addition with the Restatement (Second) and was "a specific application of the more general rule" concerning the court's role in supplying an omitted essential term of a contract. *Id.*

**40**

course the Court of Appeals determines that I cannot certify a settlement class or enforce the settlement agreement at all).

In addition, based upon the written submissions and the conferences and hearings I have held, I have made a preliminary evaluation that the settlement agreement is fair, with two exceptions: (1) attorney fees will be awarded based upon the lodestar analysis, not a contingency; one-third of the settlement amount, plus disbursements, however, will be a ceiling on any attorney fees recovery; (2) I have not yet ruled on the fairness of the proposed incentive payments to the named plaintiffs.

If neither side files a timely appeal of this order under Rule 23(f), I will proceed to settle an appropriate Notice of Final Fairness Hearing. If a timely appeal is filed, then I hereby STAY further proceedings in this matter pending a ruling by the Court of Appeals.

Finally, I urge the Court of Appeals to accept an appeal under Rule 23(f) if it is filed. Unless there is a ruling on the appropriateness of the class certification and the enforceability of the antecedent settlement, the parties and the trial court will continue to invest enormous resources in a case whose outcome remains highly uncertain and which, under the circumstances, cannot be resolved by any further settlement. Moreover, going forward without a resolution will generate great confusion for the plaintiff class, a class that by definition is not present here in Maine to understand and follow proceedings and which labors under constraints of mobility, language and other related issues. No further insights or factual development can be expected to ease the burden of decision. Passivity here is not a virtue.

SO ORDERED.